## In re NEW ENGLAND TRANSP. CO.

(District Court, D. Connecticut. December 5, 1914.)

No. 3185.

1. BANKRUPTCY ⬅─205—MARITIME LIENS—EXPENSE OF OPERATION OF VESSELS BY TRUSTEE.

    Where a bankrupt corporation was the owner of vessels which were subject to maritime liens, to establish and enforce which proceedings in admiralty were prosecuted with the consent of the bankruptcy court, and in such proceedings the vessels were sold, expenses incurred by the receiver and trustee in operating the vessels after adjudication are not allowable from the proceeds as against lien claimants, where the general estate is sufficient to- pay the same, since the earnings made became a part of such general estate.

    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 234, 303; Dec. Dig. ⬅─205.]

---

⬅─For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. BANKRUPTCY ☞210—MARITIME LIENS—ENFORCEMENT IN BANKRUPTCY PROCEEDINGS.

Where a maritime lien exists, a court of bankruptcy will enforce such lien with the same effect as would a court of admiralty, and the lien claimants will not be required to contribute toward the general expenses of the proceedings, beyond the cost of establishing and enforcing their liens, where there are other funds of the estate.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 321–323; Dec. Dig. ☞210.]

3. MARITIME LIENS ☞37—DISTRIBUTION OF PROCEEDS OF VESSEL—RULES OF PRIORITY.

Where tugs and barges of a shipowner were not employed in harbor service, but in interstate commerce, in distributing their proceeds among lien claimants, the "forty-day" rule does not apply, but the liens may more equitably be given precedence in accordance with the yearly rule.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 58–70; Dec. Dig. ☞37.]

In Admiralty and in Bankruptcy. In the matter of the New England Transportation Company, bankrupt. On distribution of proceeds of vessels owned by bankrupt, in admiralty proceedings to enforce maritime liens.

Hyland & Zabriskie, of New York City, for libelants Burt & Mitchell Co. and Johann Swenson.

Alexander & Ash, of New York City, for libelant Burns Bros.

De Lagnel Berier, of New York City, for libelant Hudson Oil & Supply Co.

Frederick H. Wiggin, of New Haven, Conn., for trustee.

THOMAS, District Judge. The New England Transportation Company, a domestic corporation having its principal place of business at New Haven, was for a long time the owner of the tugs Resolute and Fred E. Ives together with a fleet of coal barges. The tugs were employed in the towing of these barges and other vessels between the port of New York and various cities and towns on the Long Island Sound in Connecticut, Rhode Island, and as far east as Massachusetts.

The company became involved financially, and in July, 1913, proceedings in bankruptcy were instituted against it in this court. During the time the vessels were operated by the company, numerous claims accrued against them for repairs, supplies, and other necessaries.

Suits in admiralty were commenced against the Ives in this court before bankruptcy proceedings were instituted, and in due course she was attached and sold by the marshal, and her proceeds have since been distributed among the various lienors; the trustee in bankruptcy having filed a disclaimer of any interest in the sale fund.

After the proceedings in bankruptcy were commenced, the lienors holding liens upon other vessels of the fleet obtained from the acting judge of this court an order allowing them to file libels and enforce their liens in admiralty. This was done, and under appropriate proceedings, in which the trustee joined with the libelants, the vessels were sold at public auction by the United States marshal.

Thereafter Henry G. Newton was appointed special master to hear

and report upon all libels and claims against the proceeds of the respective vessels. He died in March, 1914, before completing his work, and on April 4th in the same year Harrison Hewitt was appointed special master in his place. He made and filed his report on or about June 27, 1914, to which exceptions were duly taken.

The matter is now before the court on exceptions to the report of the special master, to whom was assigned the duty of ascertaining and reporting the amount and order of precedence of payments to libelants and maritime lienors and claimants out of the proceeds of the sale of the vessels which belonged to the bankrupt at the time of its adjudication in bankruptcy.

The vessels were sold by the marshal and trustee jointly, by order of the then acting judge of this district. The exceptions taken to the master's report concern: (a) Certain recommended payments out of the sale proceeds covering an allowance for fees and expenses to the trustee's attorney; (b) an allowance of the usual commission to the referee on cash to be disbursed to libelants and maritime lien claimants; (c) certain expenses incurred by the receiver and trustee for wages and supplies while they were conducting the bankrupt's business with the referee's sanction, subsequent to the date of bankrupt's adjudication; and (d) failure of the trustee to collect and credit the tug Resolute with the amount of a certain outstanding account representing part of the earnings of that tug while being operated by the trustee.

Exceptions are also taken to the rule invoked by the special master as to the amount and order of payments to be made where the proceeds of sale of certain of the vessels are insufficient to pay libelants and maritime lien claimants in full.

Instead of the proceeds obtained from the sale of the vessels being placed in the treasury of the court, as required by admiralty rules, the acting judge, upon the petition of the trustee in bankruptcy, directed that when a sale of the vessels was made, the proceeds thereof, less the amount required for clerk's fees and the marshal's fees and expenses, should be paid over to the trustee in bankruptcy to hold and pay out under order of court. The acting judge further directed that the same expenses and costs as are taxed in admiralty be allowed as preferred claims to libelants and to those entitled to maritime lien claims.

The vessels which were sold and the amounts obtained for each were as follows:

| | |
|---|---:|
| Resolute | $6,375 00 |
| Columbia | 1,850 00 |
| Carlos French | 2,100 00 |
| M. H. Fuller | 2,025 00 |
| G. B. Martin | 800 00 |
| Shamrock | 2,200 00 |
| E. G. Stoddard | 660 00 |
| Victoria | 2,000 00 |

| | |
|---|---:|
| Making the total sale receipts | $18,010 00 |
| From this amount there was paid to the clerk and marshal for fees and expenses the sum of | 868 61 |
| And the balance, amounting to | $17,141 39 |

was then turned over to the trustee in bankruptcy.

The special master recommends that there be paid out of this fund, as expenses of administration, the following items:

(a) An allowance to himself for services, amounting to............. $ 100 00
(b) An allowance for the services and disbursements of the former special master, now deceased, amounting to................ 428 65
(c) An allowance to the trustee for his services and disbursements, amounting to........................................... 285 00
(d) An allowance to the trustee's attorney for his services and disbursements, amounting to................................. 526 05

A total of........................................... $1,339 70

He also recommends that the proceeds of sale of each vessel contribute to this total, apportioning it according to the respective amounts for which each vessel sold. Thus apportioned, each vessel's share is as follows:

Resolute ........................................................ $475 26
Columbia ....................................................... 137 49
Carlos French................................................... 156 02
H. M. Fuller.................................................... 150 44
G. B. Martin.................................................... 59 43
Shamrock ....................................................... 163 45
E. G. Stoddard.................................................. 49 03
Victoria ........................................................ 148 58

He further recommended that from the proceeds of sale of the tug Resolute there be paid a special fee of $75 to the trustee's attorney for special services rendered in relation to a claim against that vessel, as also expenditures amounting to $1,426.56 made by the trustee for that vessel while operating her, although he has furnished no itemized statement of the expenditures.

The referee having asserted the right to receive a commission on all disbursements made to libelants and maritime lienors of all the vessels, the special master has recommended that the proportionate part of the referee's commission of 1 per cent. be paid from the proceeds of sale of the respective vessels.

The special master. has further recommended that, where the proceeds of sale of any of the vessels are insufficient to pay in full those entitled to maritime liens thereon, such of the maritime lien claims as accrued within 40 days next prior to the date of the filing of the petition in bankruptcy be first paid, and that claims accruing within the 12 months next prior to the beginning of said 40 days be then paid, and so on in successive 12-month periods, until the fund of the particular vessel shall have become exhausted.

In view of the fact that there is a large fund belonging to the estate in the hands of the trustee other than that obtained from the sale of the vessels, I am of the opinion that there should first be paid from the proceeds of sale the following amounts:

Special master's services......................................... $100 00
Former special master's services and expenses...................... 428 65
Expenses incurred by trustee's attorney............................ 76 05
Allowance recommended as compensation to the trustee for his services and expenses................................................. 285 00

Total ...................................................... $889 70

This total amount shall be contributed from the proceeds of each vessel in such proportion as the amount which the trustee receives as the net proceeds of sale of the particular vessel is found to bear to the whole amount received by him as trustee from the sale of all the vessels. Therefore the special master's report will be confirmed to this extent, and the order of distribution will be found in a later part of this opinion.

It will also be confirmed, in so far as he has recommended the payment of a fee for special services to the trustee's attorney out of the proceeds of sale of the tug Resolute, and the taxable costs recommended for payment to the proctors of the several libelants.

[1] The special master's report must be overruled, in so far as he has recommended payment, out of the proceeds of sale, to the trustee's attorney of the amount claimed for general services rendered by him, the commissions claimed by the referee, and the expenses incurred by the receiver and trustee in operating the bankrupt's business subsequent to the commencement of bankruptcy proceedings.

The trustee, however, must also be allowed his expenditures in so far as he paid the crews and employés of the several vessels for wages earned by them prior to July 25, 1913. The respective amounts of these wages chargeable to each vessel will be found in a later part of this opinion.

All moneys earned by the vessels while being operated by the receiver and trustee properly belong to the general fund of the estate, and that fund should be credited with such earnings, instead of the particular vessel engaged in the earning. This being so, it would be unfair to charge any portion of the proceeds of sale with the cost of such operation, as it seems hardly probable that, had the results of the operation of the business by the receiver and trustee resulted in a profit, instead of showing a loss, the general creditors would then be satisfied to permit the profit so made to inure to the benefit of the maritime lien claimants of such of the vessels as were engaged in producing such profit. Were there no general fund sufficient to pay all the expenses of administration, the court might be justified in obliging the maritime lien claimants to contribute thereto, from the proceeds of sale of the vessels, a greater amount than they are required hereby, in which event the judgment herein would naturally follow the rule stated in the following cases: In re Cramond (D. C.) 145 Fed. 966; In re Sanford Furniture Mfg. Co. (D. C.) 126 Fed. 888; In re Baughman (D. C.) 163 Fed. 669—although none of those cases involved any question of maritime liens.

[2] The general rule to be followed in cases of this kind is as follows:

"Where a maritime lien exists, either a court of bankruptcy or of equity will enforce such a lien with the same effect as would a court of admiralty." The Ironsides, Fed. Cas. No. 7069; In re Scott, Fed. Cas. No. 12,517; In re Kirkland, Fed. Cas. No. 7842.

Applying this rule in so far as it may be applied, I am of the opinion that the holders of maritime liens should not now be asked to contribute more, inasmuch as they have already been obliged to contribute such a large amount from the proceeds of sale of the vessels to meet clerk's

fees and the fees and expenses of the marshal, together with the allow-- ances asked as compensation for the special masters and their disburse- ments and the allowance suggested for the services of the trustee. For this reason the general fund in the hands of the trustee must be resort- ed to for the payment of the other recommended expense items.

[3] The special master's report contains this statement:

"I shall assume that all liens accruing *within forty days prior* to the 23d day of July, 1913, the commencement of bankruptcy proceedings, have pref- erence over the others, and are to be paid in full if the proceeds *of the sale of the vessel are sufficient.* This seems to be in accordance with the opinions of Judge Townsend and Judge Platt and the New York decisions."

After discussing the cases he concludes with this statement:

"Applying these principles, liens accruing between June 13 and July 22, 1913, inclusive, will take precedence of all others. Liens accruing after July 22, 1912, will take precedence of all prior liens, and liens accruing between July 23, 1911, and July 22, 1912, inclusive, will take precedence of all liens prior to them, and so as regards liens accruing between July 23, 1910, and July 22, 1911, inclusive."

From these statements it will be noticed that the special master has first followed in part the "40-day" period rule, and then adopted a "12- month" period rule, while the "40-day" rule sanctioned by Judge Brown in The Proceeds of The Gratitude (D. C.) 42 Fed. 299, and followed by Judge Hough in The Glen Island (D. C.) 194 Fed. 744, intended *suc- cessive* "40-day" periods, and the "yearly rule" where applied as in The Philomena (D. C.) 200 Fed. 873, and in The Bethulia (D. C.) 200 Fed. 876, referred to calendar years, so that the special master has not fol- lowed either of these rules as they are ordinarily understood and ap- plied.

The Fred E. Ives, whose home port was New Haven, was also own- ed by the bankrupt, and was a companion tug to the Resolute. The Ives, for several years previous to her seizure, had, like the Resolute, been engaged in towing barges and other craft in the waters of Long Island Sound, making trips from as far east as Providence, R. I., to as far west as the New Jersey coast.

Libels having been filed against the Ives, she was arrested by the marshal of this district at the port of New London, just one week be- fore the day the bankrupt filed its petition in bankruptcy. A decree was obtained against her, as the result of which she was sold and the avails of sale paid into the registry of this court. The bankrupt's trus- tee then filed a disclaimer of any interest in the sale fund on account of the large number of maritime liens against her.

The commissioner, who was appointed to ascertain and report the amount of the maritime liens against the Ives, their right to priority, and their consequent order of payment out of the fund obtained by her sale, filed his report in this court, and the same was afterwards confirm- ed, and the fund disbursed in accordance with the commissioner's rec- ommendations.

Referring to the matter of priority of the several maritime liens and the order of their payment, the commissioner expressed himself in the following language:

"The theory upon which all these rules are predicated, whether it be the so-called 'voyage rule,' the 'season rule,' the '40-day rule,' the '30-day rule,' or

the 'yearly rule,' is that the vessel should be allowed sufficient time wherein to earn her freight and pay her bills before being seized and held for the debt; and this, of course, carries with it the further idea that, the larger the bill, the more time should be allowed the vessel. * * * The Ives was not a harbor tug, within the meaning of that term as applied in the Cases of The Gratitude and The Glen Island, both of which tugs were engaged in and about the harbor of New York, while the Ives was engaged in interstate commerce. Consequently, no principle of law enunciated in those decisions will be violated if the '40-day rule' be not followed here. * * * By applying the 'yearly rule,' which in this case is practically the 'season rule,' most justice will be done to all parties, as thereunder all who furnished supplies and did repairs to the Ives from January 1, 1913, up to the time the marshal arrested her (all these claims being of equal rank), will be permitted to share pro rata in the fund in proportion to their several claims accruing during this period, as the fund is insufficient to pay in full items of debt contracted during that time. * * * If, however, there were sufficient funds to pay in full all claims accruing during the year 1913, and more, the excess thereof should be first shared in by those whose claims accrued during the year 1912, and any overplus remaining thereafter should be first shared in by those whose claims accrued during the previous year, and so on until the whole fund would be used in settlement of the claims allowed; claims of equal rank to be treated alike, and claims founded on a tort, as of damages arising out of collision by or through the negligence of the tug, to have preference over earlier contractual claims for supplies furnished in accordance with the rule laid down in the case of The John G. Stevens, 170 U. S. 113 [18 Sup. Ct. 544, 42 L. Ed. 969]. * * *"

If the court should adopt the "40-day period" rule recommended by the special master in this case, it would mean that two very large claims against the Resolute, viz., Tietjen & Lang Dry Dock Company and James Shewan & Sons for repairs and materials furnished her during February, 1913 (and without which it would have been impossible for that vessel to have continued in her work), would be paid in part only, instead of in full, whereas supplies of much less import furnished her during the 40-day period recommended by the special master would be paid in full. The same would be the case with reference to the G. B. Martin and the E. G. Stoddard, against which vessels R. S. Bushey has a large bill for repairs made during January, 1913.

In view of the fact that the maritime lien claims against the vessels of the bankrupt's fleet herein concerned are like those which were filed against the Ives, both in their nature and point of time when they accrued, it will tend to uniformity if the rule adopted by the commissioner in the Ives Case be followed in this. Therefore the report of the special master must be overruled on this point, and the fund shall be distributed in the following manner:

First. There shall be paid from the avails of sale of all the vessels the items of administration expense hereinbefore allowed, amounting to $889.70, each vessel to share in the payment in the proportion indicated, to wit:

| | |
|---|---|
| Resolute | $314 93 |
| Columbia | 91 39 |
| H. M. Fuller | 100 04 |
| Shamrock | 108 68 |
| Victoria | 98 80 |
| G. B. Martin | 39 52 |
| Carlos French | 103 74 |
| E. G. Stoddard | 32 60 |

Second. The trustee shall reimburse himself out of the avails of sale of each vessel for the amount which he paid to its crew and employés as wages earned prior to July 25, 1913, as follows:

| | |
|---|---|
| Resolute | $378 53 |
| Columbia | 12 00 |
| Shamrock | 12 00 |
| Victoria | 12 00 |
| Carlos French | 56 00 |
| H. M. Fuller | 56 00 |
| G. B. Martin | 56 00 |
| E. G. Stoddard | 52 00 |

Third. The trustee's attorney shall receive from the avails of sale of the tug Resolute a fee of $75 for special services rendered that vessel.

Fourth. After the above-mentioned deductions are made, the remaining avails of sale of the several vessels shall be disbursed as follows:

1. In payment of the costs allowed by the special master to the several proctors.

2. In payment of all maritime lien claims in full, where the avails of the particular vessel will permit this to be done.

3. In cases where the avails of sale of the particular vessel prove insufficient to pay all maritime lien claims in full then, in so far as is possible, those which accrued during the year 1913 shall be paid in full, and the excess of the avails of sale thereafter remaining, if any, shall be then shared in by those whose liens accrued during the year 1912, and when these are paid in full then to lienholders of the next previous year, and so on until the whole fund of the particular vessel is exhausted in the payment of such claims.

4. In cases where the fund shall be found insufficient to pay in full all lien claims of equal degree accruing during the particular year, then the fund is to be prorated between said lien claimants. Lien claims founded on a tort are, however, to rank liens for supplies or materials of a prior date, and therefore are to be first paid in full where possible.

5. Whatever balance remains after making the above payments must be turned over to the trustee as representative of the owner and shall become a part of the general fund of the estate.