**GULF COAST MARINE WAYS, Inc. v. The J. R. HARDEE et al.**

No. 117.

United States District Court
S. D. Texas, Brownsville Division.

May 6, 1952.

Kleberg, Mobley, Lockett & Weil, Corpus Christi, Tex., for libelant.

C. S. Eidman, Jr., Brownsville, Tex., for intervening libelant, Pan American State Bank.

Crain, Muggley & Hardy, San Benito, Tex., for intervening libelants, W. W. Zimmerman, d/b/a Humble Marine Station and Marine Mart, Inc.

Sharpe, Cunningham & Garza, Brownsville, Tex., for intervening libelants, Pleason and Sanchez.

Brian S. Odem, U. S. Atty., E. H. Patton, Jr., Asst. U. S. Atty., Houston, Tex., for intervening libelant, United States.

Rentfro, Rentfro & Vivier, Brownsville, Tex., for intervening libelants, Coastal Iron Works, Brownsville Nav. Dist. and Oran Neck, d/b/a Precise Electric Co.

Crawford Cofer, Brownsville, Tex., for respondents.

ALLRED, District Judge.

Original libel filed November 5, 1951, by Gulf Coast Marine Ways, Inc. (hereinafter called Gulf Coast), against the "Hardee" in rem and against the owner, Gibson Collins, in personam. The vessel was seized by the Marshal and sold under orders of the court for $6,300, now in the registry of the court.

Meantime the other libelants named above were permitted to intervene, setting up claims totaling more than $28,000. After payment of cost, only about $5,300 will be left for distribution among the claimants. The question before the court is, of course, one of priorities and distribution.

Gulf Coast's claim was for repairs to the vessel in December 1950. This was tried separately and interlocutory decree heretofore rendered for a balance of $1,530.44, plus costs and interest.

Pan American State Bank (hereafter called the Bank) claims a balance of $3,236 due on a preferred ship's mortgage for $8,000 on the Hardee, executed by the owner (Collins), dated August 9, 1950 and filed with the Collector of Customs at Brownsville August 22, 1950. The facts concerning this mortgage, its recording, etc., will be stated in detail hereafter. The Bank contends that its mortgage lien is superior to all others.

Intervenors, W. W. Zimmerman, Marine Mart, Coastal Iron Works and Oran Neck, furnished various supplies to the Hardee, some before, some after the Bank's mortgage was filed for record at Brownsville. The details will be stated as the claims are disposed of.

Pleason and Sanchez claim subrogation to the rights of the Bank, under its preferred ship's mortgage, to the extent of $2,400 by reason of payments made by them to the Bank on the note and mortgage on September 5th and October 10, 1951, under an agreement with the Bank and the owner.

Brownsville Navigation District claims $141.65 for dockage prior to the seizure and $81 after the seizure.

The Government's claim is for income taxes assessed against the owner, Collins and his wife, for the year 1943, in the sum of $17,858.32. The Government claims its lien is superior to all the maritime liens asserted by the other claimants. Since this contention, if sustained, would exhaust all the proceeds of the sale it will be discussed first.

The Hardee (a shrimp boat), was built at St. Augustine, Florida, in 1939. Later its home port was transferred to New Orleans by John R. Hardee, Jr., the owner, who sold it to the Wild Life Service of the Interior Department in December 1940. Collins, the present owner, acquired the vessel in 1944. He sold it the same year to one Toups but re-acquired it in 1945. Collins and his wife were residents of Thibodaux, Louisiana, in Lafourche Parish, but the home port of the vessel was New Orleans.

The Government's assessment for income taxes was received by the Internal Revenue Collector at New Orleans on April 16, 1949 and mailed to Collins and his wife. Notice of the tax lien "was filed with the Clerk, Parish of Lafourche, at Thibodaux, Louisiana", where Collins lived, in 1949.

The Hardee, a shrimping vessel, was being used by Collins in the shrimping trade prior to and during August 1950, in the Brownsville area. Its home port was transferred from New Orleans to Brownsville, Texas, on July 18, 1950.

On August 9, 1950, Collins executed a preferred ship's mortgage in favor of the Bank at Brownsville, to secure a note for $8,000, payable in monthly installments. The Bank secured an abstract of the ship's title from the collector at New Orleans, which showed that the vessel was clear of all liens and claims of record in that office; and, on August 22, 1950, the preferred mortgage was duly filed with the office of the Collector of Customs at Brownsville, Texas. Thereafter, at all pertinent periods, Brownsville remained the home port of the Hardee. On January 24, 1952, a balance of $3,236.60 was due on the mortgage (including interest and attorney's fees as provided in the note and mortgage).

On September 29, 1951, the Government filed another notice of its tax lien against Collins and wife in the office of the County Clerk of Cameron County, at Brownsville, Texas. Notice of the tax lien was attempted to be filed with the U. S. Customs office at Brownsville, November 7, 1951, but was rejected by the Customs office because the required affidavit was not attached and the official number and description of the Hardee was not shown.

The Government contends that since its tax lien is not maritime, its priority is not controlled by the Ship Mortgage Act, 46 U.S.C.A. §§ 911–953, 46 U.S.C.A. §§ 911–953, and, therefore, is superior to the Bank's and all other maritime liens asserted in this proceeding. All parties concede that the Government's tax lien is not maritime so no discussion of the question is necessary.

The lien and priority claim of the United States is based upon 26 U.S.C.A. §§ 3670–3672. In substance these sections provide that when a tax (due the United States) is not paid, it becomes a lien upon *all property* of the taxpayer, effective at the time the assessment list is received by the collector and continuing until the liability is satisfied; but that the lien shall not be valid against a mortgagee, pledgee, purchaser or judgment creditor until notice of the lien is filed in the office in which the filing of such notice is authorized by the law of the state in which the property is situated, when the state has by law provided for the filing of such notice; or, if the state has not so provided, until notice is filed with the clerk of the United States district court for the judicial district in which the property is located.[1]

Louisiana has adopted the Uniform Federal Tax Lien Statute which requires notice to be filed with the recorder of mortgages of the Parish where the property sought to be subjected to the lien is located.[2] Such statutes, where they are clear and unambiguous, must be construed literally[3] and where they are not substantially complied with, the Government's tax lien is not effective against mortgagees, pledgees, purchasers, etc.[4]

Here it is undisputed that while the Government filed its notice in 1949 with the Clerk of the Louisiana Parish in which Collins lived, it did not file it in Orleans Parish where the Hardee was located (since New Orleans is its home port). Therefore, the Government obtained neither lien nor pri-

---

1. The provision for filing notice of government tax liens was added by amendment of March 4, 1913, 37 Stat. 1016. Before the amendment the Supreme Court had held in United States v. Snyder, 149 U.S. 210, 13 S.Ct. 846, 37 L. Ed. 705, that the Government was not then subject to state laws requiring registration; and, in the absence of a federal statute requiring government tax liens to be recorded, they were superior to subsequent mortgages. Under the statute as amended there is no lien and no notice can be recorded until there has been a demand by the collector and a refusal to pay it by the taxpayer. Detroit Bank v. United States, 317 U.S. 329, 335, 63 S.Ct. 297, 87 L.Ed. 304. This case, however, involved a Government lien for *estate* taxes which attaches at death and is not required to be filed under 26 U.S.C.A. § 3672.

2. West's Louisiana Statutes Ann., Vol. 28, Title 52, Ch. 2, Sec. 51.

3. Miller v. Bank of America, N. T. & S. A., 9 Cir., 166 F.2d 415 and authorities therein cited.

4. United States v. Beaver Run Coal Co., 3 Cir., 99 F.2d 610; Youngblood v. United States, 6 Cir., 141 F.2d 912; see also cases collected in 174 A.L.R. 1388; Cf. United States v. The Pomare, D.C. Haw., 92 F.Supp. 185.

ority as to the vessel by the filing in Lafourche Parish.[5] Since the Bank filed its preferred mortgage with the Collector of Customs at Brownsville August 22, 1950, and the Government did not file its tax lien with the County Clerk there until September 29, 1951, clearly the Bank's claim is superior to that of the Government.

Texas has not enacted the Uniform Federal Lien Statute but has provided for the filing of such liens with the county clerk, art. 6644, Vernon's Texas Civil Statutes.[6] There arises, therefore, the question as to the superiority or priority of the Government's lien, fixed on September 29, 1951, and the claims of the other intervenors. These are of three classes: (a) the subrogation claim of Pleason and Sanchez for payments made to the Bank on September 5th ($1,700) and October 10, 1951 ($700); (b) the claims for supplies furnished the vessel before and after September 29, 1951; and (c) the claim of Gulf Coast for repairs made to the vessel after a collision in 1950.

The note of Collins, secured by the preferred mortgage on the Hardee, was payable in monthly installments of $400 for 11 months and a final payment of $3,600 due on August 9, 1951, Collins was delinquent on the final due date to the extent of $5,200. On September 5, 1951, Pleason and Sanchez (d. b. a. Brownsville Shrimp Exchange), deposited $1,700 of their own money in the Bank in the name of the Exchange as "Trustee for Gibson Collins, owner of Shrimp Boat J. R. Hardee", pursuant to a written agreement with Collins, addressed to and accepted by the Bank. This agreement recited the fact of the preferred mortgage and the delinquency on the note, the opening of the account and an obligation on the part of Pleason and Sanchez to deposit a minimum of $700 additional each month for six successive months, plus interest. If at any time the Bank felt insecure, it was given the right to apply the sums on deposit to payment of the note. The last paragraph of the agreement reads as follows:

"You are also directed not to release said preferred ship's mortgage upon receiving in full principal plus interest on the above described note until you are duly notified by Brownsville Shrimp Exchange and Gibson Collins of the exact amount, if any, paid on said note out of funds solely belonging to Brownsville Shrimp Exchange, and upon being so notified you are hereby directed to assign such portion of said note and mortgage to the Brownsville Shrimp Exchange to secure any such sums which have been advanced in payment of note plus interest by the Brownsville Shrimp Exchange".

On October 10, 1951, in compliance with the agreement, Pleason and Sanchez deposited an additional $700, making a total of $2,400, deposited as security for and to be applied on the note and mortgage at the Bank's discretion. On October 11, 1951, the Bank, deeming itself insecure, applied the $2,400 on the note and mortgage.

5. The Government concedes this since the filing of its brief which was based upon the provisions of a prior Louisiana recording statute, Chap. IV, Sec. 5016, Dart's General Statutes of Louisiana, Act No. 7 of 1924, § 1. The Government had cited the far reaching decision in Investment & Securities Co. v. United States, 9 Cir., 140 F.2d 894, holding that a Government lien for income taxes, filed in Wisconsin, the residence of the delinquent taxpayer, was good against personal assets pledged in Washington though no notice had been filed in the latter state. In view of the implications of that decision, I observe: (1) The notice was sufficient under the Wisconsin laws; (2) the assignment of the pledged assets was made expressly subject to the Government's tax claim; (3) the statute did not protect "pledgees" at the time of the assignment in 1937; "pledgee" was added by amendment in 1939. I cannot subscribe to the theory that notice filed in one state is sufficient to secure the lien against mortgages, etc., everywhere. Quite the contrary is clear to me from the provisions of 26 U.S.C. A. § 3672 requiring notice to be filed in the state or territory "in which the property subject to the lien is situated".

6. The Texas statute is silent as to *what* County Clerk the notice must be filed with. Presumably, however, it would be in the county where the property sought to be subjected to the lien is located, in conformity with the state's general registration laws.

It is clear from the written agreement that Pleason and Sanchez advanced this money on the credit of the vessel since they stipulated for and were granted a right to an assignment of the preferred mortgage from the Bank "to secure any such sums which have been advanced in payment of note plus interest; "and the bank was not to release the vessel until such amount was determined, at which time Pleason and Sanchez were to have an assignment of the mortgage to that extent. If the funds of Pleason and Sanchez had not been applied to the mortgage, the Bank would have been entitled to claim the additional amount, secured by its mortgage lien. So the entire amount due the Bank should and would have been paid out of the proceeds from the sale of the vessel.

Money advanced upon the credit of a vessel to pay maritime claims and used for that purpose, as here, entitles the person advancing it to a lien of equal dignity.[7] There can be no question, therefore, that Pleason and Sanchez are entitled to subrogation to the Bank's rights under the preferred mortgage as to the $1,700 deposited on September 5, 1951, before the Government filed its notice with the County Clerk at Brownsville; and, since the obligation to deposit the additional sums was imposed upon them on the same date, I think their rights relate back to that date as to the $700 deposited on October 10th and that such claim is on an equal footing with the Bank.

The allowance of the priority liens of the Bank and of Pleason and Sanchez will exhaust the money left in the registry after payment of court costs, etc. If I am correct in the disposition of these matters, it would seem to eliminate necessity for discussion of the most hotly briefed question—

whether the Government's tax claim, if perfected by proper notice under state law prior to the mortgage, is superior to it and the maritime liens asserted by the other parties.

The foregoing discussion and holding has been upon the assumption that the tax lien so perfected *would* give it priority over general maritime liens and even preferred mortgage liens upon a vessel. This is earnestly contested by all the libelants. The importance of the question, as well as the possibility that I may be wrong in allowing priority to that part of the claim of Pleason and Sanchez for the $700 deposited after the filing of the tax lien with the county clerk at Brownsville requires discussion of the problem.

The provisions of 26 U.S.C.A. §§ 3670–72 giving the Government a lien upon *all property* of the taxpayer upon filing of notice under state law have been set out. Generally, of course, liens have priority according to the time when they are filed. But does this mean that such a lien gives priority over favored and time honored maritime liens upon a ship, designed to keep the vessel going? Does it mean that such a tax lien is prior to the preferred liens defined in the Ship Mortgage Act, 46 U.S.C.A. § 953, enacted by Congress to encourage investments in shipping and to foster the Merchant Marine?[8]

It was held in The Melissa Trask, D.C. Mass., 285 F. 781, 783, that the tax lien statute, construed "with due regard to * * * Rev.Stat. § 3466", 31 U.S.C.A. § 191,[9] gave priority over a preferred mortgage *prior* in time to the tax levy, although it was conceded that the question was not free from doubt. The Melissa Trask has been criticized as unsound, Robinson on Admiralty, Hornbook Series, pp. 455–457.

7. Robinson on Admiralty, Hornbook Series, p. 433 and cases therein cited; 55 C.J.S., Maritime Liens, § 53, page 756; The Little Charley, D.C.Md., 31 F.2d 120. Gulf Coast, while adopting the Bank's contention as to the priority of its lien over the Government's claim, opposes the allowance of the Pleason and Sanchez claim, making a number of allegations as to matters not in evidence.

8. The Thomas Barlum, 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176; Robinson on Ad-

miralty, Hornbook Series, pp. 441–442; The Favorite, D.C.N.Y., 34 F.Supp. 324, affirmed 2 Cir., 120 F.2d 899; The Emma Giles, D.C.Md., 15 F.Supp. 502; Collier Advertising Service v. Hudson River Day Line, D.C.N.Y., 14 F.Supp. 335.

9. The cited section 3466, 31 U.S.C.A. § 191, gives priority to U. S. tax liens where a person indebted to the United States is *insolvent*, or where an *insolvent estate* is in *administration*. Here there is no claim of insolvency.

In Colonna's Shipyard v. Rowe, 4 Cir., 14 F.2d 267, *state* tax liens were held superior to ordinary maritime liens; but there was no discussion of the question of the *preferred* maritime liens defined in 46 U.S.C.A. § 953; or of the fact that while admiralty courts will recognize and enforce state created admiralty liens, it will not grant them the priority granted by the state statute.

On the other hand, The River Queen, D. C.Va., 8 F.2d 426, 427 is the leading case for the superiority of maritime over Government tax liens. While there is no showing in that case that notice had been filed, yet a levy had been made by the collector before the libels were filed and the vessel was "at least constructively in the possession of the United States." Judge Groner recognizes a "peculiar quality to the liens of seamen and materialmen" and says:

> "It is undoubtedly true that a maritime liens stands upon a higher foundation and upon broader principles than those which underlie mechanics' and materialmen's liens on houses. It is a debt against the vessel itself, and vests in the creditor a special property in her which subsists from the moment the debt arises, and follows the ship even in the hands of an innocent purchaser for value".

■ Congress, in enacting the Ship Mortgage Act, recognized this peculiar quality of maritime claims and gives them a *preferred status,* Section 953(b) of Title 46; and created a preferred status also for mortgages, second only to the preferred maritime liens defined in subsection (a) and to court costs. Section 953 of Title 46 reads as follows:

> "(a) When used hereinafter in this chapter, the term 'preferred maritime liens' means (1) a lien arising prior in time to the recording and indorsement of a preferred mortgage in accordance

with the provisions of this chapter; or (2) a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, operator, master, ship's husband, or agent of the vessel, for wages of the crew of the vessel, for general average, and for salvage, including contract salvage.

> "(b) Upon the sale of any mortgaged vessel by order of a district court of the United States in any suit in rem in admiralty for the enforcement of a preferred mortgage lien thereon, *all preexisting claims in the vessel,* including any possessory common-law lien of which a lienor is deprived under the provisions of section 952 of this title, shall be held terminated and shall thereafter attach, in like amount and in accordance with their respective priorities, to the proceeds of the sale; except that the preferred mortgage lien shall have priority over all claims against the vessel, except (1) preferred maritime liens, and (2) expenses and fees allowed and costs taxed, by the court. June 5, 1920, c. 250, § 30, Subsec. M, 41 Stat. 1004." (Emphasis supplied.)

■■ The preferred "lien arising prior in time to the recording and indorsement of a preferred mortgage" defined in subsection (a) (1) above unquestionably means a *maritime* lien. Since the Government's tax lien is non-maritime, I do not believe that it has priority, even though notice is filed pursuant to a state statute, over maritime liens in general, certainly not over the preferred maritime liens created under the Ship Mortgage Act. Congress has evidenced no clear intention to give it such status. Maritime liens and proceedings are as much "of such a specialized nature" as the Bankruptcy laws [10] and Congress evidently intended that field of law (Maritime) to govern exclusively.[11]

10. Cf. United States v. Sampsell, 9 Cir., 153 F.2d 731, 735.

11. I doubt that Congress in enacting 26 U.S.C.A. §§ 3670–72 (the tax lien and notice statute) intended that it should cover *vessels.* State recording statutes, so far as I can find, make no provision for recording notice of tax liens against

*vessels.* It may well be, since the states have not expressly provided for filing of notice of tax liens as to *vessels,* that the alternate provision of Sec. 3672 would require notice to be filed with the Clerk of the United States District Court in the District where the vessel is located.

There remains the question of priorities as between the Bank and Pleason and Sanchez on the one hand and the remaining maritime claimants on the other. The Bank intervened on January 2, 1952, attaching a photostatic copy of the mortgage and supporting affidavit. Other interventions were allowed from time to time. On January 17, 1952, at a hearing before the court at which all intervenors and would-be intervenors were represented, the court ordered sworn proofs of claims to be filed by February 4th and objections to claims to be filed by February 11th; and that a hearing be held thereon on February 15th.

The Bank filed proof of its claim on January 29th, including again a photostatic copy of the mortgage and supporting affidavit. Objections and opposition were filed to various claims but none questioned *validity* of the Bank's mortgage or the sufficiency of the supporting affidavit. The hearing was held, as ordered, in Corpus Christi, on February 15th, at which time all parties were given opportunity to offer evidence, make objections, etc., in addition to the objections filed. The court then ordered original briefs to be filed by March 3rd and reply briefs by March 17th.

Again, in the original briefs, no question was raised by any party as to the validity of the mortgage or sufficiency of the supporting affidavit. Indeed, the validity of the mortgage had been conceded by all parties. Intervenor, Coastal Iron Works, Inc., filed neither objections nor an original brief; But, in a reply brief, for the first time, Coastal questions the sufficiency of the affidavit supporting the Bank's mortgage.

46 U.S.C.A. § 922(a) gives preferred status to a valid mortgage as of the date of compliance with all of the provisions of that section if, among other things:

"(3) An affidavit is filed with the record of such mortgage *to the effect* that the mortgage is made in good faith and without any design to hinder, delay, or defraud any *existing* or future creditor of the *mortgagor* or any lienor of the mortgaged vessel". (Emphasis supplied.)

Collins' affidavit, filed with the Bank's mortgage, recites that the mortgage is made "in good faith, without any design to hinder, delay or defraud any *interests* of *future* creditors or lienors of the *mortgaged vessel*".

Coastal's belated objection is that since the affidavit fails to aver that the mortgage was made without any design to hinder, etc. any *existing* creditor of the *mortgagor,* it does not comply with the statute; and that, therefore, the mortgage is invalid, citing cases dealing with failure to record the mortgage in the proper custom's office, failure to endorse the mortgage on the ship's papers, etc.

◼ Coastal's objection at this late [12] hour will be overruled, because:

First: Coastal and all other parties waived the irregularity by failing to object and point out the error within the time fixed by the court, under all the circumstances

---

Congress has provided for recording notices of claimed liens against a *mortgaged* vessel, 46 U.S.C.A. § 925; but the Customs Collector will not record notice under the statute if the vessel is not already covered by a mortgage. C.R. Sec. 3.38(g). Thus an anomalous situation exists where the Government can record notice of its tax lien with the Collector of Customs, *if the vessel is mortgaged,* but cannot file such notice *if the vessel is not mortgaged.* Undoubtedly clarifying legislation is needed.

· Normally, persons dealing with a ship check with the customs' office at the vessel's home port. Are they required also to check the records of the county clerks to determine whether a tax lien has been filed? If so, how far back should they go? Ownership of a vessel may have changed hands several times. A tax lien may have been filed against an owner several times removed from the last transaction and no other steps taken by the Government. Surely since the customs collector furnishes an abstract of title on the vessel, that should be the logical office in which to record a lien even though the vessel is *not* mortgaged.

12. The court had read the record, the original briefs and a host of cases on many other points before being apprised that Coastal had questioned the validity of the mortgage in its *reply* brief.

enumerated above. It is apparent that the omission of the words "existing" and "mortgagor" from the affidavit is due to error—probably in the transcription of the stenographer's notes to the typewritten copy. Coastal would have the court apply a technical and literal yardstick to the Bank's omission but overlook its own oversight in failing timely to object. The rule that a party failing to object at the proper time will not be permitted later to raise the question is applied constantly to the courts.

Second: Coastal's claim is for labor, materials and services rendered and furnished between March and October 1951, long after the mortgage was filed. Coastal does not claim that it did not know of the lien, or was misled in any way. The affidavit sets out that the mortgage was without design to hinder, delay or defraud *future* creditors, or lienors of the vessel. Coastal was not an *existing* creditor of the mortgagor at the time of the mortgage and affidavit. Its libel is against the vessel, its engines, etc., solely—not against the *mortgagor*. So I fail to see how Coastal can complain of the failure of the affidavit to negative the *existing* claims of a *mortgagor*.

*Third*: It is undisputed that the mortgage was in good faith and for the benefit of the vessel, to keep it going in the shrimp trade. In the absence of fraud, I think the statute should be liberally construed. In any event, sofar as Coastal, the only complaining party, is concerned, the affidavit was in substantial compliance with the statute.[13]

▮▮▮ Now as to the claim of Marine Mart and Oran Neck: under 46 U.S.C.A. § 953, supra, the repairs on and supplies furnished to the vessel prior to August 22, 1950 (when the mortgage was filed), are entitled to priority unless waived.[14] While the Bank states *it* has no objection to the allowance of these portions of the claims, it is conditioned upon a finding of no waiver and without consideration of the rights of Pleason and Sanchez who are entitled to share upon an equal basis with the Bank. Too, to allow the claims runs counter to what has heretofore been considered the maritime rule that in fixing priorities within a class, the last in time outranks the first.

The record shows that Marine Mart furnished supplies, etc., from February 9th to May 17, 1950, before the mortgage; and Neck from January 28th to July 31st; that each continued to furnish supplies, etc., after the mortgage through January and May, 1951, respectively. Sofar as the record shows, Marine Mart was not paid a penny on its account and the last payment to Neck was October 29, 1950, more than a year before the original libel was filed. Neither Marine Mart nor Neck took any steps to libel the vessel until January 1951 and then they did not allege a preferred lien. They must have known of the mortgage after it was filed with the collector; in law they are charged with notice after its recording. I hold them guilty of laches by virtue of the long delay in asserting their claims, if, indeed, they did not waive them.

A decree will be entered providing for distribution of the proceeds of the sale now in the registry in the following order:

(1) All court costs, including sums advanced by the parties, respectively.

(2) The Navigation District's claim for dockage in the sum of $81. The Poznan, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed 955; Stewart & Stevenson et al. v. The Lulu, Ad. 48 et seq., Brownsville Division, (unreported).

(3) The claim of Gulf Coast for $125 salvage.

(4) The claims of the Bank and Pleason and Sanchez, pro-rata, in the balance.

(5) A pro-rata distribution of the remainder (if any) between the other intervenors (excepting the Government) holding maritime liens for any materials, labor, etc., within 12 months preceding the libel.

The clerk will notify counsel to submit a decree accordingly.

13. The Nan B, D.C.Alaska, 78 F.Supp. 748.

14. The Eastern Shore, D.C.Md., 31 F. Supp. 964, 966.