**STANDARD MARINE BUNKERING SERVICES, INC., Plaintiff,**

v.

**LANDMARK UNION LTD., a/k/a Landmark Shipping Lines Ltd., and the M/V PORT OF SAVANNAH, her engines, boilers, tackle, etc., in rem, Defendants.**

**EXCHANGE TRANSPORT INTERNATIONAL, INC., Plaintiff,**

v.

**M/V PORT OF SAVANNAH, her engines, tackle, boilers, etc., and Landmark Union Limited, Defendants.**

Nos. CV486–250, CV486–252.

United States District Court, S.D. Georgia, Savannah Division.

July 2, 1987.

Savannah Pilots Ass'n, Robert S. Glenn, Jr., H. Don Harper, George L. Lewis, Lamar C. Walter, George Chamlee, Karen Dove Barr, Gene F. Dyar, Therese Forrester Pindar, Savannah, Ga., for defendants.

Lamar Walter, Savannah, Ga., Glenn R. Jones, Haight, Gardner, Poor & Havens, New York City, for Sarum Traders.

Robert S. Glenn, Jr., Savannah, Ga., for Masterlease Ltd.

F. Saunders Aldridge, III, Theodore T. Carellas, Savannah, Ga., for CSX Trans. Inc.

Edward T. Brennan, Randolph Donatelli, Savannah, Ga., for McAllister Bros., Inc. and McAllister Lighterage, Inc.

Thomas V. Halley, Halley & Chalos, New York City, and John G. Hunter, Savannah, Ga., for Exchange Transport Intern.

Edwin D. Robb, Jr., Savannah, Ga., for 1st Nat. Bank intervenor.

Fred S. Clark, Malberry Smith, Mark A. Bradley, Savannah, Ga., for M.J. Hogan & Co., Inc., American Trans–Freight, Inc., Textainer Inc. and Sea Containers.

Don Smart, Savannah, Ga., for Hicklin Motor Lines.

William Bell, III, Savannah, Ga., for intervenor Lambert Point Docks, Inc.

## ORDER

EDENFIELD, District Judge.

On June 8, 1987, a portion of the above-captioned action was tried before the Court in admiralty. At issue in the proceedings held on that date were the respective rights of Maher Terminals, Inc. ("Maher") and Exchange Transport International ("Exchange") with respect to the fund (currently held in the registry of the Court) generated by the sale at auction of the M/V PORT OF SAVANNAH.

The purpose of the proceedings was not to decide the dollar amounts that the mentioned parties are entitled to recover: a great many creditors have asserted lien claims and, while hearings have not yet been held with respect to the legitimacy of certain claims and the prioritization of valid liens, it is clear that the fund is inadequate to discharge all claims in full. Rather, the question litigated on June 8 and now considered by the Court is whether Maher, a provider of terminal services, possesses a lien claim for the total amount billed by it against the PORT OF SAVANNAH for stevedoring services and other necessaries ($89,955.10), or Exchange, an agent of the vessel's charterer, is subrogated in part to Maher's lien rights. Exchange's claim to

subrogation is based on the argument that it advanced $55,422.00 on the credit of the vessel and with the intention that this money be used to extinguish part of Maher's claim against the ship.

Having heard the testimony and arguments of counsel, and having reviewed the relevant documentary evidence, the Court makes the following findings of fact and conclusions of law. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

### FINDINGS OF FACT

1. Landmark Union, Ltd. ("Landmark"), a British firm organized by Italian principals, was the charterer of the M/V PORT OF SAVANNAH and the M/V PORT OF CHIOGGIA, cargo vessels utilized by Landmark in transatlantic trade between Italian and American ports.

2. Maher is a New Jersey corporation engaged in the business of providing terminal services to ocean-going vessels. Included in these services are dockage, line handling, water provision, and stevedoring. Maher provided these services for the PORT OF SAVANNAH and the PORT OF CHIOGGIA at such times as these vessels called in certain northern ports.

3. Exchange is a New Jersey corporation that provides agency services of various types for various principals. In December 1985 Exchange agreed to act as local agent for Landmark, and undertook responsibility for equipment control, sales, inside coordination, and documentation in connection with Landmark's activities in New York, New Jersey, and Connecticut. Landmark employed five other such local agents in several United States ports. Exchange maintains its offices in Jersey City, New Jersey. Mr. Richard Shannon is the president of Exchange.

4. Mr. John Funke was employed by Landmark as that company's representative in the United States. Funke rented office space from Exchange, and thus, while his work was not related to that of Exchange, Mr. Funke worked in close proximity to Exchange personnel.

5. Landmark was at no time prompt in paying for the services and supplied provided to its vessels by Maher. As a result, while Maher had initially agreed to extend thirty-day credit terms to Landmark, this practice was discontinued after a short time, and Maher subsequently informed Landmark that Maher would expect payment of past due bills before it would agree to provide services to any Landmark vessel. However, Maher did not strictly enforce this ultimatum.

6. In April 1986 the PORT OF CHIOGGIA called in New York, and was serviced by Maher. As of April 22, 1986, shortly after the departure of the PORT OF CHIOGGIA for Italy, Landmark was indebted to Maher in the amount of approximately $294,000.00. In May 1986 the PORT OF SAVANNAH called in the Port of Newark; this vessel also was serviced by Maher and was permitted to depart, despite the fact that substantial balances, including those arising out of the PORT OF CHIOGGIA's April call, remained unpaid. The amount ultimately billed by Maher for services and supplies provided to the PORT OF SAVANNAH during its May call was $89,955.10.

7. In Late May, the PORT OF CHIOGGIA was en route to the Port of New York from Savannah, Georgia, the first of the vessel's ports of call on its return from Italy. Learning of the ship's imminent arrival, Maher informed Funke that the PORT OF CHIOGGIA would not be serviced until Maher was paid for all outstanding bills. Apparently, a compromise was reached in this connection: Landmark forwarded $70,000.00 to Maher, and Maher subsequently agreed to service PORT OF CHIOGGIA upon payment by Exchange of an additional sum of $55,422.00, the total of $125,422 representing an acceptable partial payment on a substantially larger total balance due.

8. Mr. Joseph Wasco, Maher's assistant treasurer, testified before the Court that he cannot recall how the precise figure of $55,422.00 was established. However, ac-

cording to Mr. Wasco, the figure was arrived at through a series of telephone negotiations held between officials of Maher and Landmark.[1]

9. Despite the compromise, Landmark was unable to produce the additional $55,422.00 demanded by Maher. Consequently, it appeared clear that the PORT OF CHIOGGIA would not be serviced, and that, in fact, the ship might well be arrested upon its arrival. During the last week of May 1986, Mr. Funke on several occasions discussed the problem with Mr. Shannon. The latter was much concerned: Exchange was indeed Landmark's local agent, but Exchange also had productive relations with cargo interests, and these relations would not have been well-served if the vessel were not permitted to discharge or to load in New York.

10. Funke told Shannon that the payment required by Maher was for services provided by Maher to the PORT OF SAVANNAH during that vessel's call in Newark earlier in the month. In connection with the additional payment required by Maher, however, Funke did not solicit funds from Exchange.

11. On Friday, May 30, 1986, Shannon informed Funke that Shannon himself was debating whether to lend the additional funds demanded by Maher. Shannon believed that, if he were to advance funds used to pay for stevedoring charges against the PORT OF SAVANNAH, he would be entitled to a lien for necessaries, i.e., that he would be subrogated to Maher's lien rights to the extent of his advance. Shannon stated at that time that he would think the matter over during the weekend.

12. It was at all times Shannon's intention to provide funds to Maher only if the PORT OF SAVANNAH would provide security for the loan. Accordingly, he instructed one of his employees to telex for information concerning the activities of that vessel. Having satisfied himself that on May 30, 1986 the PORT OF SAVAN-

NAH was loading cargo in the Mediterranean, and that the vessel would therefore be in an American port within the coming month, Shannon decided to provide the needed funds to Maher. As to Shannon's intention and belief with respect to his prospective entitlement to lienor status, the Court finds his testimony to be in all respects credible.

13. On Monday, June 2, 1986, Shannon informed Funke of his decision; Funke, in turn, relayed the good news to Wasco. Wasco informed Funke, however, that payment from Shannon/Exchange would be acceptable only if the check issued by Exchange were certified.

14. Wasco's demand as to certification of the check gave rise to a series of telephone calls between Shannon and Wasco during the course of the day. Shannon contends that in the first of these conversations, though he mentioned his intention to Wasco that the funds advanced by applied to the balance due on the PORT OF SAVANNAH, Wasco at no time attempted to "correct" him or to inform him of Maher's quite different plans for application of the funds. The Court finds that, while Shannon may have mentioned something about the PORT OF SAVANNAH during his telephone conversations with Wasco, Shannon's own testimony on this point does not indicate that the nature of Shannon's remarks were such as to require "correction" on the part of Wasco. (Trial Transcript at 50–52). The Court finds additionally that in none of the June 2 telephone conversations did Wasco and Shannon seriously discuss the manner in which the funds should be applied.

15. Because Shannon was out of his office on business in New York City for most of the day of June 2, he spoke by telephone to Funke (whose office space, as mentioned, was rented from Exchange) and asked that the latter provide Shannon's secretary with information concerning the exact dollar figure demanded by Maher.

---

1. The Court has reviewed the account sheets submitted in evidence by Maher. To the extent that such a finding may be relevant, the Court finds that, consistent with Maher's representa-
tions, neither the $125,422.00 nor the $55,422.00 figure was determined with reference to balances due for the May call of the PORT OF SAVANNAH.

Shannon then called his secretary and directed her to draw up a check for the amount to be specified by Funke. The secretary, after speaking with Funke, drew up and signed an Exchange check in the amount of $55,422.00. She then went to the bank, had the check certified, and delivered the check to Funke; Funke then delivered the check by hand to Wasco.

16. The upper left hand corner of Exchange's check, where a space is designated for information concerning application of the check, was left blank by Exchange. Wasco claims, and the Court finds Wasco's testimony to have been credible, that had the check been marked as intended for payment of charges against a specific vessel, Maher would not have accepted it. It was at all times Maher's policy that to apply funds received from shipping lines that were behind in their payments to the oldest outstanding balances. Moreover, it would not have been in keeping with Maher's policy of protecting its lien rights to have accepted a check designated for payment of charges against a specific vessel.

17. On June 9, 1986, Wasco forwarded to Funke a proposal for application of the total of $125,422.00 ($70,000 plus the $55,-422.00 from Exchange) that Maher had thus far received in payment for Landmark's debts. The proposal indicated that the funds were to be applied to a number of outstanding charges for chassis rentals, and to the balance due on the April call of the PORT OF CHIOGGIA. There is no dispute that Funke had full authority, as the charterer's representative, to approve the proposal. Funke examined the proposal, found it unobjectionable, initialled it, and returned it to Wasco. Funke did not discuss the application of funds with Shannon.

18. As of early July, Exchange had not been reimbursed by Landmark. Concerned by this fact and by Landmark's evidently precarious financial condition, Shannon caused the PORT OF SAVANNAH to be arrested in this port on July 3, 1986. The numerous claims that ultimately were asserted against the vessel by a multitude of creditors led to the ship's sale at auction.

19. The arrest and sale of the PORT OF SAVANNAH has given rise to a protracted and expensive legal battle. The relatively small fund generated by the sale of the vessel cannot satisfy all of the claims against her; however, if all goes well, there may be sufficient money in the registry of the Court with which to pay the various parties' attorney's fees.

## CONCLUSIONS OF LAW

This is an admiralty and maritime action within the meaning of 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure. The subject matter jurisdiction of the Court is not in question.

It is generally recognized that "[a] creditor who advances money specifically for the purpose of discharging a maritime lien is subrogated to the lienor's rights." *Sasportes v. M/V Sol de Copacabana*, 581 F.2d 1204, 1207 (5th Cir.1978). There are limitations, however, on the stated proposition, and it has been held that "the rule of advances has three significant requirements: (1) that the money be advanced to a ship, (2) that it be advanced on the order of the master or someone with similar authority, and (3) that the money be used to satisfy an outstanding or future lien claim." *Tramp Oil and Marine, Ltd. v. M/V Mermaid I*, 805 F.2d 42, 45 (1st Cir. 1986). The quoted language from the *Tramp Oil* decision is amply supported by the authorities on which it is based. This Court thus finds the three "requirements" recognized by the *Tramp Oil* court to provide an appropriate framework for analysis of the parties' claims in the case at bar.

As to the first of the three requirements, Exchange argues that the language employed by the *Tramp Oil* court ignores the fact that a lien for advances may arise even where advances are made to a third party. Actually, the *Tramp Oil* court *did* recognize that "payments made to a third party *on behalf of* the vessel also may constitute advances. 805 F.2d at 45 (emphasis in original), citing *International Paint Co. v. M/V Mission Viking*, 637 F.2d 382, 385 (5th Cir.1981) and *Sasportes v. M/V Sol de Copacabana, supra*, 581 F.2d at 1207. *See*

*also Gulf Coast Marine Ways v. The J.R. Hardee,* 107 F.Supp. 379, 382–84 (S.D.Tex. 1952). In addition, Maher does not seriously dispute that an advance need not be made "to the ship" under all circumstances. In any event, in the case *sub judice* the first requirement does not warrant serious attention.

Moving on to the second requirement for a valid lien claim for advances, Exchange might have been expected to argue that its loan was provided "on the order of" Mr. Funke. Funke was the charterer's representative in the United States, and clearly had the *apparent authority* to procure an advance on the credit of the vessel. Exchange did not press this argument, however, and in fact has asserted, as has Maher, that the second *Tramp Oil* requirement is largely irrelevant to the case at bar. The Court notes that it views Exchange's provision of funds as purely voluntary and questions whether, from a legal viewpoint, the funds lent by Exchange were truly provided "on the order" of anyone. Regardless of Funke's initial statements as to his belief that Maher was requesting payment for charges on the PORT OF SAVANNAH, it is difficult to discern an intent on Funke's part, and of course impossible to find an intent on the part of the vessel's owner, to bind the vessel in connection with Exchange's loan. Therefore, Exchange's claims appear somewhat unsound when viewed only with reference to the second of the *Tramp Oil* requirements. In any event, the parties do not address this aspect of the case in detail; rather their arguments focus on the third of the *Tramp Oil* requirements. The Court thus directs its attention in the direction suggested by the parties, and finds that it is on the third requirement that Exchange's claims founder completely.

■ Maher argues that, because the money advanced by Exchange was not *actually used* to satisfy outstanding lien claims against the PORT OF SAVANNAH, Exchange is not entitled to lienor status. Maher's argument on this point is supported by both the case law and the commentators. *See, e.g., 2 Benedict on Admi-*

*ralty,* § 33, at 3–12—3–13 (7th ed. 1986); *Findley v. Lanasa,* 276 F.2d 907, 911 (5th Cir.1960); *Cantieri Navali Riuniti v. M/V Skrypton,* 621 F.Supp. 171, 189 (W.D.La. 1985), *aff'd on other grounds,* 802 F.2d 160 (5th Cir.1986); *Diaz v. The S.S. Seathunder,* 191 F.Supp. 807, 827 (D.Md.1961), citing *The Princess,* 291 F. 89, 91 (E.D.Pa. 1923); *Reconstruction Finance Corp. v. The William D. Mangold,* 99 F.Supp. 651 (E.D.N.Y.1951); *The Florine,* 1927 A.M.C. 1717 (E.D.La.1927); *The Englewood,* 57 F.2d 319 (E.D.N.Y.1932). This authority does much to incline the Court to rule in favor of Maher.

Exchange argues, on the other hand, that this third requirement—that funds actually be used to extinguish valid maritime lien claims—is not strictly enforced in all cases. It is Exchange's contention that, in the instant action, the general rule should not apply because Wasco, Maher's assistant treasurer, failed "to follow the clear. instructions of Shannon" as to the application of Exchange's funds. Exchange maintains that Maher's failure to apply the funds advanced by Exchange against balances due for necessaries supplied to the PORT OF SAVANNAH was indefensible and that, in accordance with the decision of *Inland Credit Corp. v. M/T Bow Egret,* 552 F.2d 1148 (5th Cir.1977), Maher's prospective recovery from the fund held by the Court should be impressed with a constructive trust in Exchange's favor.

In *Inland Credit,* certain funds had been advanced by two small investors for the discharge of lien claims. The preferred mortgage holder in that case, in whose control the funds advanced had been placed, failed to apply the investors' funds for the purposes intended. The Fifth Circuit determined that, where the mortgage holder was in a powerful position with respect to the transaction at issue, where the mortgage holder had already recovered sums far in excess of the small claims asserted by the investors, and where the mortgage holder had actual or constructive knowledge of the terms under which the funds had been procured from the investors by the vessel owner, it would have been inequitable to allow the corporate creditor to defeat the individual investors'

lien claims through manipulation of the funds entrusted to it. The *Inland Credit* court held that, under the unique circumstances of the case before it, the mortgage holder had had an equitable duty to apply the funds advanced toward the discharge of lien claims. Accordingly, a constructive trust was impressed, and the investors were effectively permitted to assert their liens.

It is true that where, as in *Inland Credit,* there is evidence of overreaching on the part of one maritime creditor in its relations with another such creditor, the courts on occasion may apply equitable principles of one kind or another to avoid unjust results. *See generally Gulf Oil Trading Co. v. Creole Supply,* 596 F.2d 515, 520 (2d Cir.1979) ("When justice requires it, quasi-contract will serve as the remedy for unjust enrichment."). However, in the instant case, as the Court has already determined, there was no overreaching or inequitable conduct on the part of Maher. Indeed, Exchange never made it clear to Maher that Exchange's check was to be applied only toward balances due for necessaries provided to the PORT OF SAVANNAH.

■■■ Mr. Funke, of course, did mislead Exchange in connection with the prospective application of Exchange's funds. Negligent or intentional misrepresentation on the part of an agent of the charterer, however, cannot affect *Maher's* lien rights. Thus, Maher is entitled to assert a lien for the necessary services and supplies it provided to the ship. And, absent evidence that the vessel's owner was privy to Funke's (most probably negligent) misrepresentations, it would not be "equitable," either to the owner or to other creditors of the PORT OF SAVANNAH, to find that Exchange is also entitled to assert a lien claim.

Because of the opportunities for misappropriation of loaned funds, the courts have evidenced a tendency to protect the owner to a greater extent [in situations where loaned funds are claimed to have given rise to a lien] than in situations when only materials are advanced. This means that the advancer of money cannot, even if he acts in good faith, safely rely on the master's [or charterer's or other agent's] representations that the loan will indeed be used to extinguish valid liens.

2 *Benedict, supra,* at 3–13—3–14 (footnotes omitted). *See also Findley v. Lanasa, supra,* 276 F.2d at 911. No evidence tending to indicate ratification of Funke's representations to Shannon on the part of the owner was presented at trial by Exchange.

■■ Thus, neither legal nor equitable principles support Exchange's claim that it is entitled to share in the fund held by the Court.[2]

It is without doubt that Mr. Shannon believed "in good faith" that his payment of $55,422.00 was to be used to extinguish

2. Other lien claims, not addressed in this Order, have been asserted by Maher against the PORT OF SAVANNAH. The Court takes this opportunity to address a matter that may be of some relevance in subsequent proceedings. The clear holding of the Eleventh Circuit in *E.S. Binnings v. M/V Saudi Riyadh,* 815 F.2d 660 (11th Cir. 1987), is that where a party provides services of a nonmaritime brokerage nature, such a party is rarely entitled to assert a lien, even where it may be shown the party also performs functions of an arguably maritime nature, such as husbanding of vessels. 815 F.2d at 665. The rationale behind the *Binnings* holding is that brokerage services will often comprise a substantial nonmaritime element of the party's contract, thereby rendering the entire contract nonmaritime and actions on it outside of admiralty's jurisdiction.

The analysis applied in *Binnings* with respect to a general agent is equally applicable with respect to *special* agents. In other words, it should not be thought, simply because special agents are permitted under maritime law to assert liens (while general agents are not), that all special agents will be deemed to have performed services that *entitle* them to a lien. The distinction between general and special agents relates to scope of authority, and not to the maritime or nonmaritime nature of the underlying contract. *See generally* Comment, *General Agency Agreements and Admiralty Jurisdiction,* 17 Conn.L.Rev. 595, 620–21 & n. 103 (1985). The nature of the contractual *duties* performed by any given agent must be addressed on a case by case basis. And only where brokerage functions or services of a financial or bookkeeping nature are deemed to be insubstantial elements of an otherwise maritime agreement will admiralty jurisdiction lie, either *in personam* or *in rem,* with respect to matters arising out of an agency contract.

valid lien claims against the PORT OF SAVANNAH, and that Shannon also believed that this payment would entitle him to lienor status. In light of these facts, the result reached by the Court with respect to the issues under consideration might appear harsh and inequitable. On the other hand, it must be emphasized that Exchange's provision of funds on behalf of Landmark was actually in the nature of a voluntary payment "with no strings attached" except for those which Mr. Shannon subjectively believed to exist. Under the circumstances, where the facts show that Shannon (an experienced businessman not unfamiliar with the shipping industry) did not clearly state his intention to Maher as to the intended manner of application of Exchange's "advance," where no limitation on application of the funds lent were specified on the face of Exchange's check, and where this unpleasantness could easily have been avoided had Shannon insisted on an *assignment* of Maher's lien rights against the PORT OF SAVANNAH, the Court finds itself little inclined to be charitable toward Exchange. "[I]t is clearly preferable to insist on the slight technical requirement of obtaining an assignment [and notifying the vessel of this transaction] than to open a wide door to the proliferation of maritime liens." *Tramp Oil, supra,* 805 F.2d at 46. *See also Perusahaan v. Salzachtal,* 373 F.Supp. 267, 280 (E.D.N.Y.1974) (creditor's taking of assignment and obtaining of agreement "from the Master 'as representative and agent of the owner' to permit it to assert the rights assigned," held, a factor supporting claim to subrogation).

For the reasons stated, the Court finds that Exchange is not subrogated to any portion of the lien claim asserted by Maher and, in connection with the purported "advance" of $55,422.00, Exchange has no legal or equitable claim to the funds held by this Court.

The Clerk is directed to enter judgment against Exchange Transport International.