## THE JOHN CADWALADER.

### KENSINGTON SHIPYARD & DRYDOCK CORPORATION v. PHILADELPHIA NAT. BANK.

Nos. 6382, 6409.

Circuit Court of Appeals, Third Circuit.

March 22, 1938.

On Rehearing Nov. 2, 1938.

Wm. E. Lingelbach, Jr., and Arthur Littleton, both of Philadelphia, Pa. (Morgan, Lewis & Bockius, of Philadelphia, Pa., of counsel), for Philadelphia Nat. Bank.

Shields, Clark, Brown & McCown and Charles B. Downs, all of Philadelphia, Pa. (Samuel B. Fortenbaugh, Jr., of Philadelphia, Pa., of counsel), for Kensington Shipyard & Drydock Corporation.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

On March 25, 1931, the Baltimore & Philadelphia Steamboat Company executed a mortgage for $350,000 to the Philadelphia National Bank (hereafter called the bank) on its steamboat John Cadwalader. It was duly recorded in the Custom House at Baltimore, the home port of the vessel, and all things were duly done in accord with the requirements of the Ship Mortgage Act of 1920, § 30, subsec. D, 46 U.S.C.A. § 922, to give such mortgage the status of a first preferred ship mortgage. On February 27, 1935, the bank filed a libel in the court below to foreclose the mortgage, averring it was in default. The mortgagor filed an answer admitting the averments were true and consented to the appointment of a receiver, which was done. Thereafter the vessel was condemned and sold and, after payment of expenses, the sum of $35,000 is now in the registry of the court awaiting distribution.

On March 1, 1935, Kensington Shipyard & Drydock Corporation (hereafter called Kensington) filed a libel against the steamer for repairs, material, and supplies, amounting to $15,000, alleged to be furnished from January, 1926, to April, 1930.

Thereafter a commissioner was appointed to report distribution. Before him bank claimed priority for its mortgage and Kensington claimed priority by reason of a maritime lien for supplies furnished the steamboat as above stated.

Confining ourselves to the pertinent findings of the commissioner, we note that, after hearing, the commissioner found the amount due Kensington on its alleged claim was $9,659.23, which for present purposes we accept as correct. He also found that the mortgage of bank was for good consideration given as follows:

"There was ample consideration, consisting of (1) an antecedent obligation, and (2) forbearance to call and sue upon the loan of $300,000; and (3) the lending of $33,000.00 additional at or about the time of the renewal of the loan; and (4) the renewal of the entire debt for an additional period."

So far as items 1, 2, and 4 are concerned, we need give them no present attention, for as the fund for distribution is concerned, if payable, item 3, namely the new money of $33,000, included in the mortgage, will absorb the fund for distribution. So regarding, we limit our present discussion to whether the mortgage of the bank, so far as the $33,000 new money is concerned, had priority over Kensington's claim.

In the first place, we have the finding of the commissioner that "the insolvency of Baltimore & Philadelphia Steamboat Company at the time of the execution of the mortgage has not been proved." While there was evidence that the company had

heen losing money and had difficulty in meeting its current obligations, the balance sheet offered in evidence shows its assets to exceed its liabilities by a considerable margin.

■ Secondly, Kensington, although the first item of its claim bore date of January 30, 1926, and the last item bore date of April 23, 1930, failed to place its claim of record. However, the bank was diligent, in that it had searches for liens made by its counsel and by reputable title companies, but none was found. The principle that where one of two innocent parties may suffer that one should bear the loss who made the loss possible, is here applicable, and it is manifest that if Kensington had put its claim of record, the bank would not have advanced the new $33,000.

In our view Kensington was guilty of laches and of such inaction as would, and did, injure the bank, for in The Key City, 14 Wall., 653, 660, 81 U.S. 653, 20 L.Ed. 896, it was held, as here applicable, that "the delay which will defeat such a suit must in every case depend on the peculiar equitable circumstances of that case," where "the lien is to be enforced to the detriment of a purchaser for value, without notice of the lien," and, by analogy, where, as here, bank, by Kensington's inaction, was led to advance to the mortgagor $33,000 new money, laches exist. Indeed, in its brief Kensington properly concedes that laches bar "where the equitable circumstances were such that new money or new parties had stepped into the picture and would be prejudiced by any decision holding the lien existed."

■ The question, therefore, arises, Did the bank furnish this new money in the face of notice of Kensington's having a prior lien? As the bank furnished the money and as its searches showed no lien of record, the burden is on Kensington to show notice. That there was actual notice is not proven, but the commissioner brushed the necessity of actual notice aside and held the bank had implied notice, holding as follows:

"Whether or not the Bank believed that the Shipyard held liens on the vessel is immaterial. It is sufficient to say that the liens actually existed; that there was no concealment of their existence; and that the Bank knew of the Shipyard claim, or at least should have known of it because of the statements; and that a prudent inquiry directed to the Shipyard would have developed the actual fact that liens were claimed."

■ After careful consideration, and this being a case in admiralty, we have considered the case de novo, and are of opinion the bank had neither express nor implied notice of a lien of Kensington on the particular steamer John Cadwalader. In the first place, the bank, following the provision of the Ship Mortgage Act of 1920, § 30, subsec. D, 46 U.S.C.A. § 922, took the mortgage with the sworn affidavit of the president of the mortgagor company that "said mortgage is made in good faith and without any design to hinder, delay or defraud any existing or future creditor of the mortgage or any lienor of the mortgaged vessel." Moreover, the president also testified that he wanted the new money furnished by the bank, and so told the bank, in order that he could pay the floating indebtedness. In that regard he testified:

"Q. Later, you discussed with Mr. Randolph the loan of the Philadelphia National Bank to the Baltimore and Philadelphia Steamboat Company? A. Well, later, and previous. In fact, I think before I went to the Kensington Shipyard representatives to talk about reducing these bills, I had formed in my own mind what I wanted to get them to do, and I tried to lay the ground work for ability to do it, and in that connection I went to see Mr. Randolph, I think, in August, 1930, to suggest to him that his unsecured claim be made secure by a mortgage or mortgages, and be increased at the same time by an amount which I figured would be sufficient, with the bonds that we held in our treasury, to discharge this floating indebtedness. * * * To the best of my recollection, I told him there were no liens of any kind, except the real estate mortgage. * * *

"Q. Do you remember that you told him there were no liens on the 'Cadwalader'? A. I am almost sure I told him that."

In corroboration of this, Evan Randolph, vice president of the bank, testified, "and I should like to interpolate here that he stated that the 'John Cadwalader' had no liens against it. * * * I think Mr. Cadwalader reiterated on a number of occasions that there were no liens against the 'John Cadwalader.'"

"Q. At the time that you made this new loan of $314,000.00 and the additional amount of $19,000.00, did you know of any claim of the Kensington Shipyard and Drydock Corporation? A. No, sir.

"Q. Did Mr. Cadwalader tell you of any claim of the Kensington Shipyard and Drydock Corporation? A. I have no recollection of it, Mr. Littleton. I would say that he did not, to answer that question. * * *

"Q. Did you ever hear of such a claim being asserted as a lien by the Kensington Shipyard & Drydock Corporation prior to the receipt by you of the letter of January 14, 1933? A. No, sir; I never heard of a claim of any lien by the Kensington until the receipt of Mr. Downs' letter, or rather, Mr. Cadwalader's letter.

"Q. That is the letter of January 14, 1933? A. Yes, sir."

It further appears by the proof that when the bank took the mortgage of March 25, 1931, it had no knowledge of the agreement of Kensington and Baltimore & Philadelphia Steamboat Company of February 2, 1931.

"Q. You did not at that time know that there was such an agreement in contemplation, and by 'that time' I mean February 1931? A. No, sir."

From the proofs, we gather these pertinent facts: The first item of Kensington's claim is dated January 30, 1926; the last April 23, 1930. The mortgage of the bank was taken March 25, 1931, and duly recorded. Action by the bank to foreclose was taken February 27, 1935. Kensington filed its libel March 1, 1935.

After consideration, we hold that bank had no knowledge of any claimed lien against the John Cadwalader when it took the mortgage; that Kensington was guilty of misleading laches and the bank's mortgage is entitled to priority over it, and the court should award the fund to the bank. This disposes of case No. 6382. As to case No. 6409, it follows that Kensington has no share to the fund in court and its appeal from the court's order allowing fees to the bank's proctor is moot. The record is remanded to the court below to enter a decree in accord with this opinion.

On Rehearing.

After rehearing of these cases, reargument and due consideration had, we adhere to our former disposition of the same. Accordingly, the appeal in No. 6409 is dismissed and in No. 6382 the fund for distribution is awarded to the Philadelphia National Bank.