The NATIONAL SHAWMUT BANK OF BOSTON

v.

THE WINTHROP, THE DORCHESTER, THE QUINCY.

Nos. 54–21, 54–26, 54–33.

United States District Court
D. Massachusetts.

Sept. 12, 1955.

Arthur J. Santry, Jr., Boston, Mass., for National Shawmut Bank.

Charles S. Bolster, Boston, Mass., for R. O'Brien and others.

Sumner H. Babcock, Bingham, Dana & Gould, Boston, Mass., for Bethlehem Steel Co.

Solomon Sandler, Gloucester, Mass., for Gloucester Marine Railways Corp.

C. Richard Clark, Gloucester, Mass., for Gloucester Grocery & Boat Supply Co., Inc.

William J. MacInnis, Gloucester, Mass., for Chisholm Fisheries.

Raymond H. Young, Boston, Mass., for F. J. O'Hara & Sons, Inc.

ALDRICH, District Judge.

These cases involving maritime liens are now before me as a result of a second report of the commissioner, following my opinion, D.C., 129 F.Supp. 661, recommitting his original report. In my earlier opinion, of which this is the continuation and completion, I stated that if he were to find any laches I would determine the legal consequences. He has now found laches in some instances, and for reasons hereafter discussed, I believe should have found it in more. The anticipated dilemma of A being better than B; and B better than C, and C ostensibly better than A by reason of A's subsequent laches, accordingly exists. What should be the result?

First, to dispose of a preliminary matter. It was argued at the second hearing that laches had not been pleaded. However, the subject was argued at the first hearing, and I recommitted the report thereon. A point of pleading is not well taken at this time.

We are concerned here with suppliers' liens arising during the years 1951 to 1954, inclusive, ship mortgages validly created in 1952, and proceeds of the vessels, realized from foreclosure sale, insufficient in any case to pay off the mortgage and all liens in full. The mortgagee was pardonably ignorant of the existence of the prior liens. Most of the post-mortgage lienors were ignorant as to the ante-mortgage liens, which were in many instances guilty of laches by the time the later liens accrued.

It is contended by one of the principal intervenors that as matter of law laches cannot benefit subsequent supply lienors,—that they are to be distinguished from subsequent bona fide owners, or mortgagees, of the vessel, in whose favor admittedly laches not sufficient to destroy the lien as against the original owner may exist. But the whole matter of marshalling is a strictly equitable doctrine,[1] and I adhere to my earlier view that subsequent lienors may be tantamount to bona fide purchasers upon proper application of the doctrine of laches. I cannot accept the suggestion that persons who advance supplies against the credit of the ship and obtain liens are not purchasers. What the consequences may be is something else.

In determining who is to suffer, when there is not enough for all, it seems reasonable to approach the question from the standpoint of what was the reasonable presumed expectation of the parties. This requires some historical analysis. Before the Ship Mortgage Act of 1920[2] problems frequently arose as to priority between suppliers' liens, and in this District and some others there grew up the calendar year rule—all liens in any one calendar year to share equally with each other, but to take precedence over previous calendar years, and to be subordinate

1. The U. & I., D.C.Me., 294 F. 985.

2. 46 U.S.C.A. §§ 911–984.

to all ensuing years.[3] While this rule was doubtless based in part on the concept that each new supplier conferred a benefit not only to the vessel, but to the prior lienors as well, it seems to me it included also, in rough form, a recognition of the doctrine of laches.[4] True, as the rule became accepted and stabilized it admittedly was applied without regard to the fact that in some instances a recent lienor had notice of some prior liens. In all likelihood this was because a uniform mechanical application of the rule was thought more important than an examination of its absolute justice in every case. I do not believe it should be regarded, as some intervenors contend, as a refutation of the general concept of laches being a progenitor of the rule. Indeed otherwise a calendar year rule, with its proratings as well as priorities, might have become a far simpler proposition, each individual lien in the inverse order of its inception. Be that as it may, the calendar year rule became crystallized, and suppliers knew that in case of any deficiency they would share equally with other suppliers of the same calendar year, and would outrank all previous years, but must take their chances on subsequent years.

A ship mortgage prior to the enactment of 1920 was not a lien, at least with which suppliers need reckon. Whether because the new preferred mortgage which it created was not limited to maritime purposes,[5] or for some other reason, Congress did not change this situation as to ante-mortgage suppliers.[6] (Post-mortgage suppliers were thought sufficiently protected by the recording requirements.) Therefore, at first blush, even after the Act ante-mortgage suppliers had to take their chances of the value of their liens being reduced by subsequent suppliers, but did not have to concern themselves about subsequent mortgages. This might be said to be the initial expectation of the ante-mortgage lienor.

The initial expectation of a preferred mortgagee is that he must chance ante-mortgage liens, but need not concern himself with subsequent suppliers. Parenthetically, must he bow to *all* ante-mortgage liens? I think clearly not, but will hold, for reasons already stated, that he may be a bona fide purchaser as to liens guilty of laches at the time of the mortgage.[7]

Finally, what are the initial expectations of a post-mortgage supplier? These intervenors argue that their expectations fall into two categories. They recognize that they are subject to any prior mortgage, even if they did not know of it, but say that their expectations as to other suppliers takes the form of the calendar year rule. However, I do not believe it that simple. Not only do post-lienors have constructive notice of the mortgages, but they also have notice of the Ship Mortgage Act itself, which says that even ahead of any mortgages are the ante-mortgage liens. Since this is a positive statute, to the extent that it conflicts with the calendar year rule no one had better notice of the facts or the consequences, or was in a better position of freedom of choice, than the post-mortgage lienors. Their more limited professed expectations, therefore, although not without merit, seem to me the weakest of the various lienors, and consequently the ones which should give way.

This may be examined. Suppose that A has an ante-mortgage lien of $8,000, M a mortgage of $20,000, P a post-mortgage lien of $10,000, and that the proceeds of the sale are $25,000. Suppose, further, that A was not guilty of laches at the date of the mortgage, but would be so regarded at the date P acquired his

---

3. The Jack-O-Lantern, D.C.Mass., 282 F. 899; In re New England Transportation Co., D.C.Conn., 220 F. 203.

4. The Young America, D.C.S.D.N.Y., 30 F. 789; The Lillie Mills, D.C.Mass., 15 Fed.Cas.No.8,352, p. 539.

5. Detroit Trust Co. v. Barlum S. S. Co., 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176.

6. 46 U.S.C.A. § 953.

7. The John Cadwalader, 3 Cir., 99 F.2d 678; Gulf Coast Marine Ways v. The J. R. Hardee, D.C.S.D.Tex., 107 F.Supp. 379.

lien. In this situation M, while ahead of P, took subject to A, so that from his point of view he could expect $25,000 less $8,000, or $17,000. M cannot be guilty of laches towards P.[8] P took subject to M, so that he could expect $5,000 if one disregards A, who, as to P could be held guilty of laches. On the other hand A was not guilty of laches as to M, and by the Act did not have to concern himself with the mortgage. Therefore A's only expected superior was P (whether by laches, or the calendar year rule), and $25,000 less P's $10,000 would still permit him to be paid in full. Hence, there are, of the total claims of $38,000, perhaps fair expectations of $17,000, plus $5,000, plus $8,000, or $30,000, with only $25,000 to pay them. It has been suggested that such $5,000 overage loss be prorated, but I believe any diminution of M's $17,000 would directly violate the Act, both in letter and spirit. Furthermore, to make an adjustment at A's expense between A and P would penalize A's laches towards P by charging him not only with P, but with a portion of the mortgage, as to which he was not guilty of laches, and as to which the Act says he is not subject. I believe such adjustment, even if permissible under the Act under these circumstances, which I do not decide, to be less fair than penalizing P, for the reasons previously stated.

█ Accordingly, I rule that the order of payment of the proceeds of each vessel, so far as these liens are concerned, should be . as follows: (1) the ante-mortgage liens, except any barred by laches at the date of the mortgage; (2) the mortgage; (3) the post-mortgage liens, on the calendar year rule; (4) 1951 liens guilty of laches at the date of the mortgage.

█ The commissioner found that no 1951 liens were guilty of laches at the date of the mortgages. I believe, however, that he made a mistake of law.[9] I do not quarrel with his ruling that as to a running account laches does not commence until the last item.[10] However, a running account for this purpose should mean a steady furnishing of services or supplies. The commissioner has found that as to isolated accounts laches arose in ten months. Yet in the case of Bethlehem, as intervenor, he has taken as a single running account, to cite one example, work performed over a period of three months along with another period of two months, although there was a 20 month interval of inactivity between the two periods. Fifteen of these 20 months preceded the mortgage. The running account rule is not to be so interpreted.

It is possible that the commissioner was misled by the fact that occasional payments were made to the lienor during these inactive intervals. If so, he confused proof of laches in the case of a claim against the original owner with laches merely barring a lien as against a bona fide purchaser. In this latter case, as distinguished from the former, we are concerned with the length of time the lien has existed during which the lienor could have openly enforced his lien, and not with what private efforts, successful or otherwise, he had made to reduce it. I . think that cases such as In re Marine Transit Corp., 2 Cir., 94 F.2d 7, cited by the commissioner, relate to the extinguishment of liens as against the owner. See 94 F.2d at page 10. If not, I do not choose to follow them. Where intervening rights of third persons who give credit to the vessel in reliance on the apparent status quo are concerned, private arrangements for payment as secret as the lien itself do not seem to me of any importance. The principal reason I recognize the so-called running account rule

---

8. 46 U.S.C.A. § 953; The Red Lion, D.C. E.D.N.Y., 22 F.2d 329.

9. It may be that the commissioner accepted and relied on the concession by the mortgagee that there were no laches. However, the mortgagee cannot bind the post-mortgage lienors, who are equally entitled to raise the point. I will pre-serve fully the calendar year rule as to ante-mortgage liens taken out of the Act by reason of. laches towards the mortgagee.

10. The U. & I., supra, note 1; The General Jackson, D.C.Mass., 10 Fed.Cas.No. 5,314, p. 180, semble.

is that if the subsequent lienor is to be charged with knowledge of an earlier lien, the fact that its amount may be increased by prior consecutive related transactions does not seem unreasonable. The Bethlehem situation is entirely different. I hold that its liens for services performed in 1951 fall into group (4), supra. This, of course, does not mean that it cannot apply whatever credits or payments it received to these particular accounts.[11]

The Trawler Oil Corp. claim against the Winthrop presents a somewhat more troublesome situation. Supplies were furnished in April, May, July, August, September and October 1951, which dates all preceded the mortgage by more than ten months, the normal period found by the commissioner for laches. Thereafter, following an interval of eight months, a few more supplies were furnished in June, July, and middle August, 1952. The mortgage was given the end of August. In The U & I, supra, note 1, another fishing boat fuel case, there was an interval between October and March, or five months, when the boat was laid up and no fuel purchased. The court spanned that interval, calling it a single running account. I believe that that case goes to the limit of the law, and that eight months, even if the vessel were laid up the entire period, which does not appear, is too long to be included in one single account. The Trawler Oil Corp. 1951 claim must fall into group (4).

It is contended that the commissioner's finding of ten months for laches is too short. I am not disposed to disturb this finding. In The Everosa, 1 Cir., 93 F.2d 732, a lienor brought suit after 12 months. Although during the last 6 months the vessel was foreign, which interval the court indicated was accordingly not to be counted, a finding of laches was upheld. In the case at bar the vessels were local throughout.

Except as above modified the commissioner's report on recommittal will be confirmed.[12] Counsel to present final decrees of distribution on the basis of his reports, as modified by this opinion.

---

11. The Marsodak, 4 Cir., 94 F.2d 339; In re Isaac Silver & Bros. Co., D.C.S.D. N.Y., 5 F.Supp. 955; The Tudor Press, Inc., v. University Distributing Co., 292 Mass. 339, 198 N.E. 244.

12. This is not to be taken as passing on the commissioner's finding that laches occurs three months after the termination of a running account, as distinguished from ten months after an isolated account. That question is now moot.