**MERCHANTS & MARINE BANK,**
Appellant,

v.

**THE** Fishing Vessel **T. E. WELLES,** etc.,
Appellee.

**No. 18413.**

United States Court of Appeals
Fifth Circuit.

April 12, 1961.

C. D. Marshall, Charles W. Howard, Jr., New Orleans, La., J. I. Ford, Pascagoula, Miss., Milling, Saal, Saunders, Benson & Woodward, New Orleans, La., of counsel, for appellant.

Albert S. Johnston, III, John F. Bryan, III, Pascagoula, Miss., Johnston & Wilson, Pascagoula, Miss., for Pascagoula Dock Station, appellee.

Before TUTTLE, Chief Judge, and BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

We deal with this case for a second time. As before it presents questions of priority of general maritime liens for supplies in opposition to that of a preferred ship mortgage. Laches was, or was thought to be, the important question.

On its first appearance, Pascagoula Dock Station v. Merchants and Marine Bank, 5 Cir., 1959, 271 F.2d 53, 1959 A.M.C. 2207, we did two things. First, we upheld the validity of the preferred ship mortgage of March 29, 1957. Second, we concluded that the District Judge's initial holding that the maritime lienor, Pascagoula Dock Station, was guilty of delay injurious to the interests of the Bank, but not of laches was intrinsically contradictory. Consequently, we remanded the cause for further proceedings. Our conclusions were summed up this way. "Did the Judge mean delay only or laches as that term is ordinarily understood? The legal consequences * * * turn on this fact-legal conclusion. * * * For instance, if on the remand which we order the Judge adheres to his conclusion that there was *delay* but no laches, then the decree to be entered must be in favor of the maritime lien ($1,282.12) as superior to the mortgage. Section 953(b), (46 U.S.C.A. § 953) expressly accords priority to 'preferred maritime liens' which this would then be since it would be unaffected by laches (46 U.S.C.A. § 974(2)) found not to exist." 271 F.2d at pages 57–58.

On that retrial based largely on the original record save for one new fact which we regard finally as decisive, the

Trial Court adhered to the prior conclusion, this time expressed unequivocally, that the lienor was not guilty of laches. Giving literal application, as he was most certainly entitled to do, to our direction dependent upon the specific fact finding, the Judge then held for the lienor and against the Bank. It is the Bank, the mortgagee under the preferred ship mortgage, which now appeals.

■ Amplifying the same arguments it offered previously in support of the Trial Court's then decision of priority of the mortgage over the maritime liens, the Bank renews the contention that the supplier's lien was extinguished or reduced in priority by laches. Its task on that score has now become more difficult since it is faced with the formidable prospect of overturning fact findings as clearly erroneous. O/Y Finlayson-Forssa A/B v. Pan Atlantic S. S. Corp., 5 Cir., 1958, 259 F.2d 11, 13, 1958 A.M.C. 2070, 2072; Mississippi Shipping Co. v. Zander & Co., 5 Cir., 1959, 270 F.2d 345, 347, 1959 A.M.C. 2143, 2145, 273 F.2d 618, 1960 A.M.C. 247. A finding of laches is compelled, the Bank insists, either on the analogy of the Mississippi state statute of limitation, here claimed to be six months,[1] or on general principles of maritime law apart from state statutes.[2]

■ Either alone, or as an ingredient of laches, the Bank asserts also that, as a matter of law, the lienor failed to exercise reasonable diligence since it never at any time either made inquiry at the Collector of Customs office concerning the existence of any preferred ship mortgage or, worse, recorded a notice of its maritime liens as the statute permits. 46 U.S.C.A. § 925(a).[3] See Gilmore & Black, The Law of Admiralty § 9–72 at 616 (1957). Here the Bank relies heavily on The John Cadwalader (Kensington Shipyard & Drydock Corp. v. Philadelphia National Bank), 3 Cir., 1938, 99 F.2d 678, 1939 A.M.C. 52.

Of course, as a part of this claim of non-diligence, the Bank lays itself open to like attack. But to the supplier's contention that the Bank failed to make adequate inquiry concerning the existence of outstanding debts, claims or liens, the Bank counters that it satisfied all such obligations imposed either expressly or impliedly under the Ship Mortgage Act, 46 U.S.C.A. §§ 911–984, by obtaining and filing the mortgagor's affidavit of good faith, 46 U.S.C.A. § 922(a) (3). That, it contends, is to be deemed the equivalent of specific inquiry for facts—notwithstanding that it is stated as legal conclu-

---

1. Miss.Code § 340 (1942). This statute, and some of the supremacy or supersession problems engendered by it are set out in note 3, 271 F.2d 53, at page 57.

2. The Bank cites the following as a partial tabulation of cases showing delays which have been held excessive: The Eliza Jane, D.C.Mass.1847, Fed.Cas.No.4,363, 6 months; The Jasper, C.C.Mass.1872, Fed.Cas.No.17,898, 10 months; The Lyndhurst, D.C.N.Y.1892, 48 F. 839, one year; The Algonquin, D.C.N.Y.1898, 88 F. 318, 7 months; Norfolk Sand & Cement Co. v. Owen, 4 Cir., 1902, 115 F. 778, 14 to 15 months; The Boise Penrose, D.C. N.Y.1926, 15 F.2d 70, 1926 A.M.C. 1247, 2 years; The Grace Darling, D.C.Mass. 1927, 18 F.2d 587, 1927 A.M.C. 757, 15 months; Gray v. Hopkins-Carter Hardware Co., 5 Cir., 1929, 32 F.2d 876, 1929 A.M.C. 875, 2 years; The Everosa, 1 Cir., 1937, 93 F.2d 732, 1938 A.M.C. 82, 1 year; Phelps v. The Cecelia Ann, 4 Cir., 1952, 199 F.2d 627, 1952 A.M.C.

1968, 2 years; The J. R. Hardee, D.C. S.D.Tex.1952, 107 F.Supp. 379, 1952 A.M.C. 1124, less than 2 years from beginning of account, less than 1 year from last item; National Shawmut Bank of Boston v. The Winthrop, D.C.D.Mass. 1955, 134 F.Supp. 370, 1955 A.M.C. 2089, 10 months from last item of account.

3. It should be pointed out that the duty of the Collector of Customs to "record notice of [any person's] claim of a lien" relates only to "a vessel covered by a preferred mortgage." 46 U.S.C.A. § 925 (a). There is no place to file notice of such claims beforehand. The Customs Regulations make no provisions for using the Collector's office as the repository for general information somewhat like the courthouse door. 19 CFR 3.38(g). A principal purpose is to afford maritime lienors protection in the event of foreclosure of the preferred ship mortgage, see, e. g., §§ 951, 961.

sions[4]—as to the borrower's financial situation. Refuting this, the supplier has powerful support both on general principles and the precision with which the Act gives the lender a positive right to a full and fair disclosure and compels honest, complete answers under severe criminal sanctions. §§ 924 and 941(b).

Recognizing that a plea of laches is more than time, the Bank undertook to establish detriment. It did this both as to the time of making of the original loan, and later on in 1958 when it released another vessel. The M/V Glenn and Kay, from a simultaneous preferred ship mortgage securing the common debt in order to permit her to be sold without requiring application of the full proceeds of the sale to reduce the debt. See 271 F.2d 53, 55.

And all the while there was, on any supposition or holding of laches as to the maritime liens in competition with a preferred ship mortgage, lurking many intriguing and intricate questions. This would include the effect of laches and whether it extinguishes the *in rem* lien altogether leaving only rights *in personam* for the remainder of the stated statutory period of limitations on a contract action. See Gilmore & Black, The Law of Admiralty §§ 9–77 through 9–84 at 624–40 (1957). Some have pointed out "that the issue of laches is gone into only on the problem whether or not there *is* a lien. If the question is as to the priority of liens among themselves, laches does not defeat priority." Robinson, Admiralty § 55 at 398–99 (1939). Although we do not undertake to decide the point, Judge Hough was quite positive. "Laches is a defense, and, if successful, it defeats the claim advanced by plaintiff or libellant." The Oregon, 2 Cir., 1925, 6 F.2d 968, 969, 1925 A.M.C. 1271. This might have particular importance here since the contest is between a preferred ship mortgage and a maritime lien. Section 974 of the Maritime Lien Act does declare that it shall not affect the "rules of law existing on June 5, 1920, in regard to * * * (2) laches in the enforcement of liens upon vessels, * *." Hence the Bank recognizes in its brief that if, somewhat as was done in Burdine v. Walden, 5 Cir., 1937, 91 F.2d 321, 1937 A.M.C. 1149 where effect was given to a state statute, the Court were to adjudge that the supplier's lien was stale and therefore unenforceable because of laches from failure to commence judicial proceedings within six months as § 340 of the Mississippi Code, note 1, supra, requires, there would then be the none too easy task of determining whether to approve the doctrine of The Owyhee,[5] 2

4. The statute requires "An affidavit * * to the effect that the mortgage is made in good faith and without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel." 46 U.S. C.A. § 922(a) (3).

5. This case held that a State (New York) limitation (12 months) for maritime liens constitutes laches by analogy in spite of Section 975 which superseded state laws.

46 U.S.C.A. § 975 provides:

"This chapter shall supersede the provisions of all State statutes conferring liens on vessels, insofar as such statutes purport to create rights in action to be enforced by suits in rem in admiralty against vessels for repairs, supplies, towage, use of dry dock or marine railway, and other necessaries."

The Owyhee, and its progenitors, Nolte v. Hudson Navigation Co., 2 Cir., 1924, 297 F. 758, 1924 A.M.C. 276, and The Portchester, 2 Cir., 1932, 56 F.2d 579, 1932 A.M.C. 414, have been severely criticized because the decisions seemed to be a curious transfusion of life into state statutes in the face of comprehensive legislation designed to overcome the bewildering complexities of the old half-Federal half-State structure. See Benedict, Admiralty 299–300 (6th ed. 1940) and note 37, quoting Benedict, § 466 (5th ed. 1924); Robinson, Admiralty § 55 at 398 (1939); Gilmore & Black, Admiralty 628–30 (1957). We voiced an express disapproval of Nolte. We declared that the purpose of the Maritime Lien Act "was to substitute a 'single federal statute for the state statutes insofar as they confer liens for repairs, supplies and other necessaries,'" and declared that Section 974 "of that act, did not abolish, but continued in force, the rules of admiralty law in regard to laches announced in the Key City, 14 Wall. 653,

Cir., 1933, 66 F.2d 399, 1933 A.M.C. 1185, and thus cut off the priority given by § 953 [6] to pre-mortgage preferred maritime liens. If deemed a question of priority, not the more decisive one of continued existence of the lien as such, there would be the further problem of the general pre-1920 law and the impact, if any, of state law since the pre-existing law was continued only as to "(5) priorities between maritime liens and mortgages, *other than preferred mortgages, * * *.*" § 974 [7] (Emphasis supplied.)

But all of this was on the supposition that, as tried below the first time and determined here on the first appeal, the mortgage we were concerned with was that of March 29, 1957. It was on this point that the trial on remand was so decisive. For now it appears without contradiction that the mortgage of March 29, 1957, was in reality a renewal of an earlier preferred ship mortgage of March 9, 1956.

The probable legal significance of that event is forecast by the entirely different color it throws upon the facts of the supplier's claim. Whereas all thought that the question related to priority of $1282.-12 for supplies furnished *prior* to the mortgage, it now turns out that only $40.-58 predated the initial mortgage of March 9, 1956.[8]

This newly discovered event [9] now calls for a change of course. The legal ques-

---

20 L.Ed. 896, under which courts of admiralty are not governed by any statute of limitations, recognize no arbitrary or fixed period of time within which suits may be brought, but apply the equitable doctrine of laches to the peculiar circumstances of each case." The Gertrude, 5 Cir., 1930, 38 F.2d 946, 948, 1930 A.M.C. 823.

The problem would also include that of determining whether, apart from the Owyhee type laches through operation of state statutes of limitation as an analogy, actual laches would cut off the Section 953 statutory priority of a preferred maritime lien. Judge Aldrich so held, but tested laches as of the date of the recording of the mortgage, not for delay by the maritime lienors in commencement of proceedings subsequent to the mortgage. National Shawmut Bank of Boston v. The Winthrop, D.C.D.Mass. 1955, 134 F.Supp. 370, 1955 A.M.C. 2089, and D.C., 129 F.Supp. 661, 1955 A.M.C. 1288. Judge Allred, in his celebrated opinion on tax liens, The J. R. Hardee, D.C.S.D.Tex.1952, 107 F.Supp. 379, 1952 A.M.C. 1124, likewise applied actual laches apparently based on the lienor's delay in enforcement proceedings before and after recordation of the mortgage. And see Gilmore & Black, Admiralty 614–15, 637–39 (1957).

Obviously we do not undertake to decide these questions now.

6. Section 953 provides:
"(a) When used hereinafter in this chapter, the term 'preferred maritime lien' means (1) a lien arising prior in time to the recording and endorsement of a preferred mortgage in accordance with the provisions of this chapter; * * *.
"(b) * * * except that the preferred mortgage lien shall have priority over all claims against the vessel, except (1) preferred maritime liens, and (2) expenses and fees allowed and costs taxed by the court." 46 U.S.C.A. § 953.

7. "* * * this chapter shall not be construed to affect the rules of law existing on June 5, 1920, in regard to (1) the right to proceed against the vessel for advances, (2) laches in the enforcement of liens upon vessels, (3) the right to proceed in personam, (4) the rank of preferred maritime liens among themselves, or (5) priorities between maritime liens and mortgages, other than preferred mortgages, upon vessels of the United States." 46 U.S.C.A. § 974.

8. The itemized claim covering credit (not cash) deliveries began March 8, 1956 for $40.58. The next delivery was March 11, 1956, two days after the initial mortgage. The last purchase preceding the subsequent mortgage of March 29, 1957, was on March 17, 1957. The balance outstanding at the moment of that mortgage was $1282.12. The remainder of the claim for deliveries from March 30, 1957 through February 16, 1958 was adjudicated to be subordinate to the preferred ship mortgage. 271 F.2d 53, 56.

9. Of course it is not a discovery. It is something the Bank knew although presumably its proctors were unaware of it. There is not the faintest breath of suspicion that there was any connivance or lack of good faith in this mistake.

tions are changed to these. Was this initial [10] mortgage valid as a preferred ship mortgage? What was the status of maritime liens for supplies furnished in the period March 9, 1956 to March 29, 1957? What, if anything, happened to that status when the initial mortgage was replaced by the subsequent one—did that which was subordinate now become superior?

The first is readily disposed of. This initial mortgage complied with the statute, was properly filed with supporting affidavit of good faith, recorded and noted on the ship papers. By the express terms of the statute, that made it superior to all liens of every kind and character thereafter incurred save liens for crews' wages, general average, salvage and tort claims. 46 U.S.C.A. § 953(a). At that point laches by the supplier is wholly irrelevant. The statute fixed the priority in favor of the mortgagee. Of course the Ship Mortgage Act does not outlaw maritime liens, it merely subordinates them. Consequently, all of these supplies when and as furnished gave rise to valid maritime liens. They were in existence. The mortgage did not, as such, extinguish them. They would, subject to laches or relative priority ranking among other maritime liens, continue. To the extent of any surplus remaining after satisfaction of the preferred ship mortgage debt, such liens would participate in the distribution. § 953(b). See also § 961(c) and Gilmore & Black, The Law of Admiralty § 9–54 at 587 (1957). And if the mortgage debt has been voluntarily paid in full, such liens which had thus come into being from the moment of furnishing the supplies would thereupon have the vitality which the Maritime Lien Act and general maritime law would accord them.

That means that the crucial question is the legal significance of the execution and recording of the subsequent mortgage as a renewal of the initial one. Was the superior lien of the initial mort

gage extinguished? With the statutory impediment evaporated, did the traditional maritime liens now flower into full bloom? Did the subsequent mortgage come into being as a security subject to outstanding valid maritime liens prior in time and hence in right (unless thereafter extinguished or subordinated by laches)? Did it begin its life with a congenital infirmity?

The facts which are significant are few and undisputed. The initial mortgage was to secure a note for $12,000. The balance due at the time of the subsequent mortgage, March 29, 1957, was $7,771.50. At that time the Bank agreed to loan an additional $4,000 for which, after some minor adjustments, the vessel owners were to, and did, execute a new note for $11,500. The parties to this transaction were the owners of the two vessels and the Bank. The purpose or intention of no other party is relevant. For the new advance and for the remaining balance still due on the initial loan, the owners intended to offer, and the Bank expected to obtain, a preferred ship mortgage. The mechanics to effect this additional advance with preferred security were these. On March 29, 1957, a new note was executed in the sum of $11,500. Simultaneously, the Bank executed a formal satisfaction of the initial mortgage on the Customs House form and the owners, as mortgagors, executed a new preferred ship mortgage. The new (subsequent) mortgage and the satisfaction of the original (initial) mortgage were filed simultaneously with the required documents at the Customs House on April 4, 1957. The security was the same, the parties were the same, the debt was substantially the same.

In this situation we think every consideration leads to the application of generally well-accepted legal principles concerning mortgages. The passage of the Ship Mortgage Act came about primarily from the necessity of affording substantial security to persons supplying

---

10. We use this in lieu of "first" to avoid confusion with the common security situation of a first and second mortgage.

Likewise, the mortgage of March 29, 1957, is referred to as "subsequent."

essential financing to the shipping industry. 1 Benedict, Admiralty § 78 at 181 (1940); Gilmore & Black, The Law of Admiralty § 9–48 at 570, and see § 9–49 through 9–51. With all of its statutory protections, it still has infirmities in contrast to land-based securities.[11] Nevertheless, the statute overcomes the basic weakness that a ship mortgage was a non-maritime contract presenting difficult, if not impossible, procedural problems in effectual enforcement and substantively was subject all the while to the maritime liens of ship suppliers. Benedict, supra § 77 at 162; Gilmore & Black, supra § 9–47 at 568. Since the aim was to afford as substantial protection to lenders as the peculiar nature of maritime operations would permit, the approach ought to be one of harmony with usual security principles.

■■ The accepted rule is that unless a contrary intention of the parties clearly appears, the execution and delivery of a new mortgage in renewal of a former one, even though accompanied by a formal satisfaction and discharge of the initial mortgage, does not have the effect of extinguishing the priority which the initial mortgage carries. The subsequent mortgage given in renewal is prior to liens which arose or would otherwise have come into being during the period of the initial mortgage. 36 Am. Jur. Mortgages §§ 458, 457, 459. A comprehensive annotation states that it is the general rule that "where the holder of a senior mortgage discharges it of record, and contemporaneously therewith takes a new mortgage, he will not, in the absence of paramount equities, be held to have subordinated his security to an intervening lien unless the circumstances of the transaction indicate this to have been his intention * * *." 33 A.L.R. 149; see also The Bergen, 9 Cir., 1933, 64 F.2d 877, at pages 880–881. This is especially so where the junior lien came into being (as here) during the currency of the prior mortgage, so that attributing to the renewal mortgage the priority of the initial one leaves the junior lienor in exactly the same position had no renewal mortgage been executed. 33 A.L.R. 149, 162–165; supplemented in 98 A.L.R. 843.

■ It is undisputed that at the time the subsequent note and mortgage were executed, nearly $8,000 remained due on the initial note and mortgage. The debt was not paid off at that time. No funds were advanced with which to pay it off. The money advanced was confined to the additional $4,000. It would be contrary to everything which both parties had in mind for a court to conclude that it was the purpose of the Bank to relinquish the preferred status which it had by virtue of the initial mortgage and rely altogether on a new security then to be obtained. The new security would inescapably be exposed to the substantial perils of the sea—here the awesome nature of the pervasive, ofttimes secret, maritime liens, whose priority is expressly recognized in § 953(a) (1). If that were to occur there would have to be a moment—invisible, unmeasurable, undiscernible—just after the former ceased to exist and immediately before the subsequent came into being. At that moment what was formerly inferior would now, as the sole lien, become superior. To import into the maritime finance security field any such metaphysics would be more than personifying a vessel and a lien. The lien would not only be, in Holmes' words, a "brooding omnipresence," it would ripen suddenly into a superior right without any purposeful action having a relation to the practical needs of ship suppliers, vessel operations or ship mortgages.

■ Thus after two trials and two appeals, the case approaches an end. All there is left is the item of $40.58 for the first supplies furnished on March 8, 1956. Literally, we could say that when the District Court declared no laches,

---

11. Liens arising from claims for crews' wages, salvage, general average and damages for torts, e. g., personal injury, death, collision, fire, cargo damage, are all superior. 46 U.S.C.A. § 953(a). Insurance, if maintained, collectible and adequate in coverage, may fill some of the gaps.

this small item was included. We think it would be inappropriate to refer the whole matter back over that small item. Taking into account all that both records and findings teach, we are satisfied that had this been the only item the Judge would have concluded that failure to assert this claim for over two and one-third years in the face of two preferred ship mortgages has extinguished whatever lien there might once have been.[12]

Reversed and rendered.

12. The appellant Bank had to appeal and it prevails. Ordinarily costs would follow. Since the first appeal, the remand and re-appeal may well have been unnecessary had the Bank proved the initial mortgage, each party will bear its own costs of this appeal and the prior adjudication of costs in the first appeal will remain unchanged.