The **MASTAN COMPANY,** Incorporated,
Plaintiff,
and
**Allied Van Lines, Inc.,** et al., Intervenors,
v.
**S. S. SAPPHIRE SANDY,** her engines, tackle, etc., Defendant.

Civ. A. No. 284-67.

United States District Court
D. New Jersey.

Nov. 22, 1968.

Lafferty, Rowe, McMahon & Mc-Keown, by Richard F. McMahon, Jr., Newark, N. J., for plaintiff, Zock, Petrie, Sheneman & Reid, by George D. Byrnes, New York City, of counsel.

Gross & Novak, by Edward Gross, Newark, N. J., for Todd Shipyards Corp.

## OPINION

WORTENDYKE, District Judge:

The Mastan Company, Incorporated (Mastan) filed its complaint on March 15, 1967 against the S. S. Sapphire Sandy (Sandy), her engines, boilers tackle, apparel, furniture, etc. to foreclose the first preferred fleet ship mortgage, dated December 29, 1965, and thereafter amended and supplemented, given by Sapphire Steamship Lines, Inc. (Sapphire), the owner of the vessel, to secure indebtedness of Sapphire to Mastan.

The Sandy, being within the jurisdiction of this Court, was sold by the United States Marshal for the District of New Jersey on May 22, 1967 for the sum of $160,000 and said sale was confirmed by this Court's Order of May 24, 1967. The proceeds of the sale of said vessel (the fund) were deposited in the Registry of this Court pursuant to the Order confirming the sale.

By its Order of June 30, 1967 this Court appointed Louis N. Freeman, Esq., as Special Master pursuant to F. R.Civ.P. 53, to hold hearings and determine the amount and priority of all claims filed against the Sandy and to report his findings to this Court.

On August 19, 1968 the Special Master filed his report with the Clerk of this Court in which after reviewing the evidence presented before him he found and reported as follows:

"Accordingly, there is absence of any fraud, delay or hindrance, or any design to the detriment of all creditors and, * * * [there were] affirmative acts and deeds of 'good faith' as set forth and recorded in the preferred fleet ship mortgage of December 29th, 1965, and its supplemental agreements and mortgages.

Accordingly, Todd has no fixed rights to participate and receive any money from the fund in the Registry of the Clerk of the Court. Todd did not offer any *pro forma* proof establishing its right to assert a maritime lien.

The Valid Amount of Mastan's claim entitled it to receive the balance of the fund in the Registry of the Clerk of the Court, less taxed costs and disbursements to be assessed and ordered to be paid by the Court.

It is recommended that all interest, penalties for late payments and other finance charges as of February 28th, 1967 be denied; and that Mastan accordingly be allowed immediately to withdraw from the Registry of the Court the remainder of the balance of the sum of $61,183.67, after current taxed costs are paid.

The final order in the cause should award the entire proceeds in the registry, after payment of taxed costs, to Mastan."

To the report of the Special Master objections were filed respectively by Mastan and Todd Shipyards Corporation (Todd), which were argued before the Court on October 14, 1968. At the conclusion of the oral arguments on that date the Court reserved decision and now embodies its decision in this Opinion.

Mastan urges five objections to the Master's Report, viz:

1.  The finding that the preferred mortgage debt owed to Mastan is limited to $866,580.43;

2. The finding that all interest, penalties for late payments, and finance charges as of February 28, 1967 should be denied;

3. The finding that all interest, penalties for late payments and finance charges should be cut off as of March 13, 1967, the date upon which Sapphire filed its petition under Chapter XI of the Bankruptcy Act;

4. The finding that the interest rate, penalties for late payments and finance charges which Mastan agreed to pay to Sapphire were excessive;

5. The findings referred to in objections 1 through 4 supra were unnecessary to the Special Master's decision because moot, for the reason that the amount in the Registry of the Court is far below the amount of the preferred mortgage debt.

Mastan therefore asks the Court to confirm the Master's Report in all respects excepting those features to which Mastan objects, and to assess against Todd, in favor of Mastan, costs and expenses attributable to the presentation of evidence relevant to the marshalling of assets and the alleged fraudulent character of Mastan's ship mortgage.

In support of its contention that the Master's Report should not be confirmed Todd contends:

1. The mortgage of Mastan is not entitled to preferred status under the Ship Mortgage Act of 1920;

2. The equitable concept of marshalling of assets is applicable in the instant proceedings;

3. The interest and finance fees should reduce the debt owing to Mastan to $805,243.85.

In support of its contention that Mastan's mortgage is not entitled to a preferred status Todd summarizes the evidence before the Master as follows:

Mastan loaned Sapphire $1,296,000 with knowledge that the borrower was insolvent in December of 1965. The money so loaned was used by Sapphire for the acquisition of vessels which were simultaneously encumbered by the mortgage to Mastan. Moreover Mastan obtained liens on all other available assets of Sapphire which otherwise could have been available to existing creditors of Sapphire. The shipowner's ultimate default in its monthly mortgage payments caused substantial losses to its existing creditors in December 1965 and to its future creditors as well. Nevertheless, in August of 1966 Mastan increased its mortgage lien by $53,000 under an agreement which provided a 2% penalty charge against the shipowner on any payment default. Accordingly, Todd argues that the conduct of Sapphire and Mastan from early December 1965 through August 1966 did not disclose actions in good faith but constituted fraud which hindered, delayed and obstructed existing and future creditors of Sapphire. The testimony of the witness Pogash is referred to as supporting the alleged harm to existing creditors because moneys used to meet the monthly mortgage payments to Mastan were thereby diverted from the payment of existing indebtedness, and future creditors were injured by relying upon the security of a maritime lien which would be valueless if the mortgage were deemed preferred. It is Todd's contention in this respect that future creditors of Sapphire would be justified in assuming that there was some equity in the vessel over and above the mortgage, and that they would not have rendered services or supplied materials to the vessel "if Mastan did not grant this fraudulent mortgage to Steamship." The evidence is uncontradicted that both the mortgagor and mortgagee were fully aware when the mortgage loans were made that the mortgagor was insolvent. Todd argues therefore that Mastan knew of Sapphire's insolvency when making the loans. All of the loan proceeds went to parties other than Sapphire, and Mastan

obtained liens on all of Sapphire's assets. Todd contends that the result of the transaction was the completion of Sapphire's financial ruin to the detriment and harm of its existing and future creditors. Therefore Todd contends that the mortgage transactions were fraudulent, and that the mortgages should be held null and void and disentitled to priority under Section 922(a) (III) of the Ship Mortgage Act.

It is obvious that, if the mortgages were valid and entitled to priority under the statute, Todd's other objections to the Master's Report become moot because the balance of the proceeds of the sale of the Sandy is insufficient in amount to satisfy the principal sum of any of the promissory notes secured by the mortgage.

In support of Todd's contention that there was an absence of good faith in the ship mortgage transaction it refers to the following aspects of the evidence before the Special Master:

"1. The Sapphire was hopelessly insolvent;

2. Its insolvency was known to Mastan and confirmed by the expert testimony of Pogash;

3. The degree of Sapphire's insolvency rendered its ability to service its mortgage obligation inconceivable."

With respect to the possible mootness of Todd's claim, it was disclosed on oral argument that the amount of that claim was approximately $35,000. The fleet mortgage of Mastan covered 3 vessels; 2 of them were sold in the Netherlands for a gross price of $733,000. Todd contends that that amount plus the amount in the Registry of this Court, together with other assets of Sapphire consisting primarily of insurance proceeds "may be more than sufficient to satisfy a valid mortgage if the court finds it to be such under the Ship Mortgage Act and still permit at least a partial dividend to maritime lien creditors."

Todd also contends that the Special Master committed error in excluding evidence offered in support of Todd's contention that there should be a marshalling of Sapphire's assets between Mastan and Todd. It was reported that in certain insurance policies covering the vessel Sapphire was named as insured and Mastan as loss payee and that only Mastan could claim the proceeds of the policy. These proceeds approximated $135,000, but were sold by Mastan for $15,000. Todd claims to have evidence of other insurance claims on the three vessels which were then in process of collection, but complains that the Special Master limited proffered testimony by the collector who expressed willingness to deposit the funds collected in the Registry of this Court.

Todd points out that at the hearings before the Special Master all parties present stipulated that evidence should first be presented by Mastan on its preferred ship mortgage claim and that the Special Master should then report upon the validity and extent of that claim before receiving evidence in behalf of the Maritime Lien claimants. This stipulation was entered into to conserve time and because of the recognition that if the ship mortgage were found valid in an amount in excess of the fund in the Registry of Court, the other maritime lien claims would be rendered moot. Todd however contends that the finding of the Special Master that Todd and other maritime lien claimants waived their claims by failing to offer testimony in support thereof is unwarranted. With this contention the Court concurs.

The evidence disclosed that Sapphire's initial loan agreement with Mastan was made on December 28, 1965, and contemplated an amount of $1,296,000. Although $864,000 of the foregoing amount purported to be loaned to Sapphire no part of that amount was actually paid over to Sapphire; but pursuant to a letter of instructions, dated December 29, 1965, prepared by Mastan, Sap-

phire directed Mastan to disburse the loan as follows:

(a) $205,000 on account of the purchase of Sandy from Overseas Carriers Corporation;

(b) $495,000 on account of the purchase of the Natalie (Now Sapphire Gladys) from International Carriers;

(c) $100,000 to be withheld by Mastan pending completion of certain ship repairs by check payable to Sapphire and endorsed by it to Mastan;

(d) $64,000 representing a finance fee, by check of Mastan to Sapphire and by Sapphire endorsed back to Mastan.

Simultaneously with the execution of the letter of instructions Sapphire executed a promissory note for $864,000 to Mastan payable in monthly installments of $39,840 over a term of two years with a collateral note guaranteed by Sapphire and its corporate affiliates. The mortgage note secured by the Preferred First Fleet Mortgage represented a loan of $800,000 for a term of two years plus a finance fee of $64,000 representing interest at the rate of 8% on the principal of the note. The check for $64,000, although payable to Sapphire, was immediately endorsed back to Mastan. Although Sapphire had no use of the amount of finance charge, it was required to pay interest at the rate of 6% thereon as well as upon the sum of $100,000 while held in escrow pending completion of the ship repairs. Out of this escrow deposit $60,000 was applied by Mastan against monthly payments due under the terms of the loan.

On January 21, 1966 Sapphire gave its promissory note to Mastan for $432,000, with another letter of instructions prepared by Mastan authorizing the disbursement of that amount by two checks. One for $400,000 payable to Oceana Clippers Inc., for the purchase of the S. S. Sapphire Etta, and the other in the amount of $32,000 payable to Sap-

phire and immediately reendorsed by it to Mastan which represented a finance fee computed at the rate of 8% for a two year period on the loan of $400,000. Upon this finance fee as well as upon the principal of the $400,000 loan Mastan charged interest at the rate of 6% per annum.

On July 19, 1966 Mastan caused a letter to be signed by Sapphire requesting that $60,000 of the sum held in escrow by Mastan for ship repairs, pursuant to the letter of December 29, 1965, be applied by Mastan to the monthly payments becoming due on the two outstanding loans. This was done by Martin Gold, acting for Mastan, as disclosed by his letters of July 21 and 29 respectively. By agreement between Mastan and Sapphire the mortgage loans were extended and the amount of the monthly payments called for by the terms thereof was reduced from $58,000 to $33,000. The testimony of Mastan's Vice President, McGreevey, disclosed that he received on or about August 10, 1966, a certified financial statement, dated July 29, 1966, from which it appears that Sapphire's financial condition deteriorated during the period commencing with the date of the making of the initial loan, and that Sapphire was hopelessly insolvent. Nevertheless on August 29, 1966, Mastan and Sapphire entered into a supplementary agreement extending the mortgage loan for 27 months from August 29, 1966 and reducing the required monthly payments under the mortgage to $33,386.26. At the same time Mastan loaned Sapphire an additional sum of $52,817.73 which was not disbursed to Sapphire but charged as an additional finance fee and added to the unpaid balance of $96,000 as of August 29, 1966. This latest finance fee of $55,817.73 was never disbursed to Sapphire but merely treated as a loan under the agreement between the parties.

■ The Special Master found, and this Court agrees, that the finance fee of $64,000 on the loan of $800,000, and the finance fee of $32,000 on the loan of $400,000, were excessive. Todd concedes

that a finance fee of $38,490 (4% of $800,000) and a finance fee of $18,222 (4% of $400,000) would be appropriately allowable but that a finance fee of $52,817.73 representing interest on a principal amount never advanced to Sapphire was entirely disallowable. Therefore Todd contends that the debt owing by Sapphire to Mastan should be fixed at $805,243.85 and not $866,580.43 as fixed by the Special Master.

Although the record of the mortgage as filed under the Act includes an affidavit by the mortgagor "to the effect that the mortgage is made in good faith, and without any design to hinder, delay or defraud any existing or future creditors of the mortgagor, or any lienor of the mortgaged vessel," Mastan contends that the evidence before the Master fails to support the averment of the affidavit.

In Pascagoula Dock Station v. Merchants & Marine Bank, 271 F.2d 53 (5 Cir. 1959), relied upon by Todd, a preferred ship mortgage was held valid and the lien thereof preferred and paramount to maritime liens accruing subsequent to its effective date in the absence of its use in fraud of creditors. At page 54 of the Opinion it is stated that:

"* * * except for such circumstances [proof and finding that mortgagor and mortgagee undertook to use the device of a preferred ship mortgage in fraud of creditors] there is no statutory obligation on the part of the mortgagee to make any inquiry. It might, of course, affect the status of the mortgage as to prior liens— * * * but an absence of inquiry does not vitiate the mortgage as such. The mortgagee may, and perhaps ought for his own protection, require the mortgagor to disclose in writing prior to the execution of the mortgage the existence of any maritime liens, prior mortgages or other obligations. * * *

* * * * * *

* * * But the statute does not impliedly forbid separate and distinct preferred ship mortgages on several vessels as security for a single debt. The purpose behind Section 922(e) and (f) is to make certain that where several properties are covered in a *single* mortgage that the special statutory mortgage lien shall or may be released as to any one property on the payment of a specified or ascertainable sum. * * * Where the mortgage covers but a single vessel, there is no need to apportion as between it and nonmaritime property or other vessels. In such case the documents of the particular vessel concerned will reflect that she is subject to a full preferred ship mortgage lien to the extent of the debt, whatever it might be."

There is no evidence before the Master in this case of the existence of any maritime or other lien upon any of the vessels covered by the mortgage at the time the loan agreements were entered into between the parties. There was no refutation of the allegations that the mortgage and its supplemental agreements were timely filed and recorded in strict compliance with the statute. The mortgagor was a corporation and may not plead usury. However exorbitant the finance charges and interest rates imposed by the lender may appear, they were agreed to by the borrower and its incurrence of the consequent obligations was not in fraud of any then existing creditor or maritime lienor. The Master's finding that the mortgage and its supplemental agreements constituted a preferred lien upon the vessels covered thereby was amply supported by the evidence before him and he therefore properly excluded testimony proffered to impugn the loan transactions for which the mortgage and related documents were given as security.

There remains the contention that the Master in the exercise of the inherent equitable jurisdiction of this Court should have applied the doctrine of "marshalling". Todd asserts that if such doctrine had been applied by the Master Todd's claim would have found

support to a degree against the fund in the Registry of this Court. The Master refused to apply such a doctrine and this Court affirms him in having done so.

In National Shawmut Bank v. The Winthrop, The Dorchester, The Quincy, 134 F.Supp. 370 (D.C.Mass.1955), the Court held that a ship mortgage prior to the enactment of the Act was not a lien with which suppliers to the vessel need reckon even after the enactment "ante-mortgage suppliers had to take their chances of the value of their liens being reduced by subsequent suppliers, but did not have to concern themselves about subsequent mortgages * * *." Post-mortgage suppliers "are subject to any prior mortgage, even if they did not know of it, * * *." The Court in *Shawmut* ruled that the order of payment of the proceeds of each vessel covered by the mortgage should be as follows:

"(1) the ante-mortgage liens, except any barred by laches at the date of the mortgage;

(2) the mortgage;

(3) the post-mortgage liens, * * *;

(4) * * * liens guilty of laches at the date of the mortgage."

In the present case we are not concerned with any ante-mortgage liens and therefore out of the proceeds of sale of the Sandy the mortgagee is entitled to be paid.

■ With respect to the contention of Todd that the equitable doctrine of marshalling should have been applied by the Master, it is clearly inapplicable here because the creditor (mortgagee) had only the single fund represented by the balance of the proceeds of the sale deposited in the Registry of the Court out of which to satisfy its debt. Sowell v. Federal Reserve Bank, 268 U.S. 449, 45 S. Ct. 528, 69 L.Ed. 1041 (1925). And compare Meyer v. United States, 375 U. S. 233, 84 S.Ct. 318, 11 L.Ed.2d 293 (1963).

For the reasons hereinabove set forth the Report of Louis N. Freeman, Esq., as Special Master, filed with the Clerk of this Court on August 19, 1968, will be in all respects confirmed and an Order may be presented so providing.